## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No._____

IN THE MATTER OF
THE EXTRADITION OF
KEVIN YUNGMAN

_____/

FILED BY \_\_\_\_**ABM**\_\_\_\_ D.C.

**Jul 30, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

### COMPLAINT
### (18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to Ireland.

2.      There is an extradition treaty in force between the United States and Ireland.[1]

3.      Pursuant to the Treaty, the Government of Ireland has submitted a formal request through diplomatic channels for the extradition of Kevin Yungman ("Yungman").

4.      According to information provided by the Government of Ireland, Yungman is wanted for prosecution for rape in violation of Section 48 of the Offences Against the Person Act of 1861, and Section 2 of the Criminal Law (Rape) Act of 1981, as amended by section 21 of the Criminal Law (Rape) Act of 1990.

5.      This offense was committed within the jurisdiction of Ireland. The District Court Judge for the Dublin Metropolitan Area issued a warrant for Yungman's arrest on February 18, 2020.

---

[1] Extradition Treaty Between the United States of America and Ireland, U.S.-Ir., July 13, 1983, T.I.A.S. No. 10813 (the "1983 Treaty"), as amended by the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland signed 13 July 1983, U.S.-Ir., July 14, 2005, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex. The Annex reflects the integrated text of the provisions of the 1983 Treaty and Instrument (collectively referenced hereafter as the

6.     The Government of Ireland is seeking Yungman's extradition for the purpose of prosecution based on the following facts:

a.     On June 6, 2018, A Brazilian national working as an au pair in Ireland (the "victim") reported to Irish authorities that Yungman had raped her on the night of June 4, 2018, and into the early hours of June 5, 2018. The victim provided Irish authorities with a detailed statement, in which she described her relationship with Yungman and the rape that occurred, the details of which are described below.

b.     According to the victim, she initially met Yungman while on vacation in Paris in April 2018. They spent two days together in Paris, during which they engaged in a sexual relationship. The victim explained that her sexual encounter with Yungman in Paris began consensually; however, later in the encounter, Yungman put one hand on her neck and squeezed, causing the victim to lose consciousness. When the victim awoke, she told Yungman that she was "really scared," and asked Yungman what he had done to her, to which Yungman replied that the "technique" was intended to simulate a drug-induced high during sex. This was their only sexual encounter while in Paris.

c.     After the victim returned to Ireland, she and Yungman remained in contact via social media, and they planned a trip for Yungman to visit Dublin in June 2018. On June 3, 2018, Yungman arrived in Dublin and went to an Airbnb the victim had booked for them to share. The victim explained that she and Yungman became physically intimate later that evening, but that they got into an argument when the victim told Yungman she did not want to engage in unprotected sex, and Yungman refused to wear a condom. Although the victim and

"Treaty").

2

Yungman ultimately engaged in consensual unprotected sex that evening, the victim said she regretted doing so and she decided to refuse unprotected intercourse with him in the future.

      d.     On the night of June 4, 2018, Yungman tried to initiate sex with the victim upon returning to the Airbnb following a day of sightseeing. When he did so, the victim told him that "what happened yesterday [was] not going to happen again." Yungman responded that "he wasn't going to do anything [the victim] did not want to do." Yungman did not, however, stop touching, fondling, and disrobing the victim. When Yungman tried to pull the victim's pants off, she told him that she did not want to take her pants off. Yungman did not comply with the victim's wishes and continued to remove the victim's pants. The victim said "no" again, but Yungman persisted, assuring the victim that he was "only going to take them down to [her] knees." When Yungman subsequently pulled the victim's pants off entirely, she again asked him to stop, telling him that she "didn't want to do anything, that that was enough."

      e.     Although Yungman assured the victim once again that he was not going to do anything that she did not want, he then climbed on top of her. When the victim attempted to get away from Yungman, he turned her over to face the sofa, took her undergarment off, and inserted his penis into her vagina. At this point Yungman had his hand on the middle of the victim's back, which prevented her from moving. The victim said that she felt his penis enter her vagina repeatedly. While this was occurring, the victim repeatedly said "no" and used the "safe word" the pair had previously agreed upon to use if they wanted to end a sexual encounter. The victim also refused to comply when Yungman repeatedly demanded that she raise her backside into the air, and once again told Yungman "no." The victim reported that this rape lasted approximately five or six minutes, and while she does not think that Yungman ejaculated,

she knows that he was not wearing a condom.

      f.     Later that same night, Yungman tried to initiate sex again, but the victim refused, telling Yungman, "you put your penis in me… I told you not to do it…you're going to do it again." The victim said that Yungman then showed her a condom and promised to wear it if she joined him in the bedroom. She said that she refused again, but when Yungman threatened to carry her into the bedroom, the victim relented and joined Yungman in the bedroom.

      g.     While in the bedroom, Yungman again forced the victim to have vaginal intercourse. Despite his promise to wear a condom, Yungman inserted his penis into the victim's vagina. When the victim again demanded Yungman put the condom on, he did briefly, but he quickly removed it. The victim refused to continue without protection. At this point, Yungman stopped for some time before touching her vagina again. The victim tried to move away from Yungman, but he put both hands around the victim's neck and squeezed until she lost consciousness. When the victim woke up, Yungman's penis was inside of her vagina. Yungman continued to engage in sexual intercourse with her even when the victim asked him to "please stop." The victim explained that she was too weak to physically stop Yungman herself. After the victim told Yungman several more times to "please stop" because her "body could not take it," Yungman finally relented and allowed the victim to return to the living room.

      h.     On June 6, 2018, the victim filed a complaint with the police against Yungman. She provided a WhatsApp text message that she received from Yungman on June 5, 2018. In his message, Yungman apologized saying "know that nothing like this will ever happen again."

      i.     Police arrested Yungman at Dublin Airport as he attempted to board a flight on June 6, 2018. They interviewed him twice at the police station. Both times he alleged that his

4

sexual encounters with the victim were consensual; however, he confirmed that he had sent the above message to the victim.

       j.      Police took a photograph of Yungman on June 6, 2018, while he was in police custody. A copy of this photograph, accompanied by the statement of a police sergeant identifying Kevin Yungman as the person depicted in the photograph, are included in the extradition request. This photograph appears to depict the same individual as depicted in the U.S. and Argentine passports included in the extradition request.

7.     Based on information gathered and provided by the U.S. Marshals Service, Yungman is believed to be residing within the jurisdiction of this Court at 406 Sailboat Cir., Weston, Florida 33326.

8.     Stacy Hauf, an attorney in the Office of the Legal Adviser of the United States Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note and subsequent supplement by which the Government of Ireland requested extradition as well as a copy of the Treaty. The declaration states that the offense for which Ireland requests extradition is provided for by the Treaty and confirms that the documents supporting the extradition request bear the certificate or seal of the Department of Justice, or Department responsible for foreign affairs, in Ireland so as to enable them to be received in evidence in accordance with Article VIII of the Annex.

9.     The declaration from the Department of State with its attachments, including a copy of the diplomatic note and subsequent supplement from Ireland, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

10.    Yungman likely would flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of Kevin Yungman be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Ireland so that the fugitive may be arrested and brought before this court to the end that the evidence of criminality may be heard and considered, and that this Complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

Felipe Plechac-Diaz
Assistant United States Attorney

Sworn to before me and subscribed
in my presence this 30 day of July 2024.

HONORABLE ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

6

# Exhibit #1

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Kevin Yungman. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States of America and Ireland are found in the Treaty on Extradition between the United States of America and Ireland, signed July 13, 1983 (the "1983 Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Ireland signed 13 July 1983, signed July 14, 2005 (the "Instrument"). The annex to the Instrument (the "Annex") reflects the integrated text of the provisions of the 1983 Treaty and the Agreement on Extradition between the United States of America and the European Union, signed June 25, 2003. A copy of the Instrument with Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the Embassy of Ireland has submitted Diplomatic Note No. 534/674, dated July 6, 2021, formally requesting the extradition of Kevin Yungman. The Department of Justice of Ireland submitted additional information relating to this request to the United States Department of Justice by letter dated December 6, 2023. Copies of the diplomatic note and letter are attached to this declaration.

4. In accordance with Article XVI of the Annex, the Government of the United States represents the interests of the Government of Ireland in proceedings in U.S. courts arising out of Ireland's extradition requests, and the Government of Ireland provides similar representation in its courts with respect to extradition requests made by the United States.

-2-

5. The offense for which the fugitive's extradition is sought is extraditable under Article II of the Annex.

6. Under Article VIII of the Annex, documents that bear the certificate or seal of the Department of Justice, or Department responsible for foreign affairs, of the requesting state are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy authentication requirements without the need for certification by the U.S. Embassy in Dublin. Ireland, in submitting documents in the instant case that bear the certificate or seal of the Department of Foreign Affairs and the Department of Justice, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 12, 2024.


STACY HAUF

Attachments:

1. Copy of Note

2. Copy of Instrument with Annex

EXT-YUNGMAN-00002

# Ambasáid na hÉireann
Embassy of Ireland



Our Ref: 534/674

The Embassy of Ireland presents its compliments to the United States Department of State and has the honour to refer to the Treaty on Extradition between Ireland and the United States of America, done at Washington on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005, and on behalf of Ireland requests the extradition from the United States of America of Kevin Yungman, a citizen of the United States of America and of Argentina.

The said Kevin Yungman is wanted by the Irish authorities for prosecution in connection with the offence of rape contrary to section 48 of the Offences Against the Person Act, 1861 and Section 2 of the Criminal Law (Rape) Act, 1981 as amended by section 21 of the Criminal Law (Rape) Act, 1990.

In accordance with Article VIII of the aforesaid Treaty the following information and documents, in support of the request for extradition, are submitted herewith under the seal of the Minister for Foreign Affairs of Ireland:

- Information which will help to establish the identity of the person sought, his location, and a brief statement of the facts of the case, pursuant to Article VIII(2);

- as accurate a description as possible of the person sought, together with other information which will assist in establishing the person's identity and nationality, pursuant to Article VIII(3)(a);

- a statement of the pertinent facts of the case, indicating the time and place of commission of the offences, pursuant to Article VIII(3)(b);

- a legal description of the offence and a statement of the maximum penalties therefor, together with the text of the law setting forth the offence pursuant to Article VIII(3)(c);

- an authenticated copy of the arrest warrant, pursuant to Article VIII(4)(a);

- an authenticated copy of the information, pursuant to Article VIII(4)(b);

- a statement of facts, by way of affidavit setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it, pursuant to Article VIII(4)(c);

**2234 Massachusetts Ave NW, Washington D.C. 20008, USA**
T +1 202 462 3939 | washingtonembassy@dfa.ie
www.dfa.ie/usa
Follow us on Twitter @IrelandEmbUSA

# Ambasáid na hÉireann
## Embassy of Ireland



The Embassy wishes to notify the United States Department of State that, pursuant to Article IX of the aforesaid Treaty, the Irish authorities are willing to provide additional material and supplementary information should this be required, including material and information relating to the documents contained in this request. In addition, the Irish authorities are prepared to make available police officers for the purpose of identification of the said Kevin Yungman and/or other officials for the purpose of giving Court evidence in the United States of America in relation to any matter arising by virtue of this request.

The Embassy attaches hereto a folder containing authenticated original documents under the seal of the Minister of Foreign Affairs for Ireland and three (3) copies of this folder.

The Embassy requests the United States Department of State to keep it informed of developments in relation to this request.

The Embassy of Ireland avails itself of this opportunity to renew to the United States Department of State the assurance of its highest consideration.

Embassy of Ireland                                                6 July 2021
Washington



**2234 Massachusetts Ave NW, Washington D.C. 20008, USA**
T +1 202 462 3939 | washingtonembassy@dfa.ie
www.dfa.ie/usa
Follow us on Twitter @IrelandEmbUSA

EXT-YUNGMAN-00004

An Roinn Dlí agus Cirt
Department of Justice



51 Faiche Stiabhna, Baile Átha Cliath 2, Éire D02 HK52
51 St. Stephen's Green, Dublin 2, Ireland D02 HK52
T +353 1 6028202
www.justice.ie

Criminal Division
Office of International Affairs
US Department of Justice

**Re:** **Kevin Yungman, Extradition Request to the United States of America**

**Attention:** **Vaughan A. Awry / Rachel M. Yasser, Office of International Affairs**

With regard to the Irish issued extradition request for Mr. Kevin Yungman, please see attached additional information provided by the Office of the Director of Public Prosecutions who has carriage of this matter.

If you require anything further, please do not hesitate to ask the undersigned.

Brendan Farren
Mutual Assistance & Extradition
Department of Justice
06 December 2023

EXT-YUNGMAN-00005

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.12

# EXTRADITION

**Instrument Amending the**

**Treaty of July 13, 1983**

**Between the**

**UNITED STATES OF AMERICA**

**and IRELAND**

Signed at Dublin July 14, 2005

*with*

Annex



EXT-YUNGMAN-00006

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# IRELAND

## Extradition

*Instrument amending the treaty of July 13, 1983.*
*Signed at Dublin July 14, 2005;*
*Transmitted by the President of the United States of America*
*to the Senate September 28, 2006 (Treaty Doc. 109-14,*
*109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*July 29, 2008 (Senate Executive Report No. 110-12,*
*110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
*September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Diplomatic Notes at Washington*
*August 11 and 12, 2009;*
*Entered into force February 1, 2010.*
*With annex.*

**Instrument as contemplated by Article 3(2) of the
Agreement on Extradition between the United States of America
and the European Union signed 25 June 2003,
as to the application of the Treaty on Extradition between
the United States of America and Ireland signed 13 July 1983**

1.    As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"), the Governments of the United States of America and Ireland acknowledge that, in accordance with the provisions of this Instrument, the U.S.-EU Extradition Agreement is applied in relation to the bilateral Treaty on Extradition between the United States of America and Ireland signed 13 July 1983 (hereafter "the 1983 Treaty on Extradition") under the following terms:

(a)    Article 5 of the U.S.-EU Extradition Agreement as set forth in Article VIII(1) and (7) of the Annex to this Instrument shall govern the mode of transmission, and requirements concerning certification, authentication or legalisation of the extradition request and supporting documents;

(b)    Article 7(1) of the U.S.-EU Extradition Agreement as set forth in Article VIII(8) of the Annex to this Instrument shall provide an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

(c)    Article 8(2) of the U.S.-EU Extradition Agreement as set forth in Article IX(3) of the Annex to this Instrument shall govern the channel to be used for submitting supplementary information;

(d)    Article 9 of the U.S.-EU Extradition Agreement as set forth in Article VII *bis* of the Annex to this Instrument shall govern the temporary surrender of a person being proceeded against or serving a sentence in the Requested State;

(e)    Article 10 of the U.S.-EU Extradition Agreement as set forth in Article XII of the Annex to this Instrument shall govern the decision on requests made by several States for the extradition or surrender of the same person;

(f)    Article 11 of the U.S.-EU Extradition Agreement as set forth in Article XII *bis* of the Annex to this Instrument shall govern the use of simplified extradition procedures;

(g)    Article 12(3) of the U.S.-EU Extradition Agreement as set forth in Article XV(2) of the Annex to this Instrument shall govern the procedures governing transit in the event of unscheduled landing of aircraft;

(h)    Article 13 of the U.S.-EU Extradition Agreement as set forth in Article VI of the Annex to this Instrument shall govern extradition with respect to conduct punishable by death in the Requesting State;

(i)    Article 14 of the U.S.-EU Extradition Agreement as set forth in Article VIII *bis* of the Annex to this Instrument shall govern consultations where the Requesting

1

State contemplates the submission of particularly sensitive information in support of a request for extradition.

2.      The Annex reflects the integrated text of the provisions of the 1983 Treaty on Extradition and the U.S.-EU Extradition Agreement that shall apply upon entry into force of this Instrument.

3.      In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Instrument shall apply to offences committed before as well as after it enters into force.

4.      This Instrument shall not apply to requests for extradition made prior to its entry into force; except that, in accordance with Article 16 of the U.S.-EU Extradition Agreement, Article VII *bis* of the Annex shall be applicable to requests made prior to such entry into force.

5.      (a)      This Instrument shall be subject to the completion by the United States of America and Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

        (b)      In the event of termination of the U.S.-EU Extradition Agreement, this Instrument shall be terminated and the 1983 Treaty on Extradition shall be applied. The Governments of the United States of America and Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorised by their respective Governments, have signed this Instrument.

DONE at Dublin, in duplicate, this 14 day of July 2005.

FOR THE GOVERNMENT OF THE          FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:            IRELAND:

2

EXT-YUNGMAN-00010

ANNEX

## TREATY ON EXTRADITION BETWEEN

## THE UNITED STATES OF AMERICA AND IRELAND

### ARTICLE I: Obligation to Extradite

Each Contracting Party agrees to extradite to the other, in accordance with the provisions of this Treaty, but subject to the law of the Requested State and to such exceptions as are therein provided, any persons, including its citizens or nationals, who are wanted for prosecution or the imposition or enforcement of a sentence in the Requesting State for an extraditable offence.

### ARTICLE II: Extraditable Offences

1. An offence shall be an extraditable offence only if it is punishable under the law of both Contracting Parties by imprisonment for a period of more than one year, or by a more severe penalty. When the request for extradition relates to a person who is wanted for the enforcement of a sentence of imprisonment, extradition shall be granted only if the duration of the sentence still to be served amounts to at least four months.

2. For the purpose of this Article, it shall not matter:

   (a) whether the laws of the Contracting Parties place the offence within the same category of offence or denominate the offence by the same terminology; or

   (b) whether the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

3. Subject to the conditions set forth in paragraph 1 of this Article, extradition shall also be granted for attempt and conspiracy to commit, aiding, abetting, counselling, procuring, inciting, or otherwise being an accessory to the commission of, an offence referred to in paragraph 1.

4. If extradition is granted for an extraditable offence, it may also be granted for any other offence for which extradition is requested that meets all the requirements for extradition other than the periods of imprisonment specified in paragraph 1 of this Article.

3

**ARTICLE III: Place of Commission of Offence**

1. Extradition shall not be refused on the ground that the offence for which extradition is requested was committed outside the Requesting State.

2. Extradition may be refused when the offence for which extradition is requested is regarded under the law of the Requested State as having been committed in its territory. If extradition is refused pursuant to this paragraph, the Requested State shall submit the case to its competent authorities for the purpose of prosecution.

**ARTICLE IV:  Exceptions to Extradition**

Extradition shall not be granted in any of the following circumstances:

(a) when the person whose surrender is sought has been convicted or acquitted, or a prosecution is pending against that person, in the Requested State, for the offence for which extradition is requested;

(b) when the offence for which extradition is requested is a political offence. Reference to a political offence shall not include the taking or attempted taking of the life of a Head of State or a member of his or her family;

(c) when there are substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinion. Unless the law of the Requested State otherwise provides, decisions under this paragraph shall be made by the executive authority; or

(d) when the offence for which extradition is requested is a military offence which is not an offence under the ordinary criminal law of the Contracting Parties.

**ARTICLE V:  Discretionary Grounds for Refusal of Extradition**

Extradition may be refused in any of the following circumstances:

(a) when the person whose surrender is sought has been convicted or acquitted in a third State of the offence for which extradition is requested; or

(b) when the competent authorities of the Requested State have decided to refrain from prosecuting the person whose surrender is sought for the offence for which extradition is requested, or to discontinue any criminal proceedings which have been initiated against that person for that offence.

4

**ARTICLE VI: Capital Punishment**

Where the offence for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied.

**ARTICLE VII: Postponement of Surrender**

When the person whose extradition is requested is being, or is about to be, proceeded against, or has been convicted, in the Requested State in respect of an offence other than that for which extradition has been requested, surrender may be postponed until the conclusion of the proceedings and the full execution of any punishment the person may be or may have been awarded.

**ARTICLE VII *bis*: Temporary surrender**

1. If a request for extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.

2. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State at the conclusion of the proceedings against that person, in accordance with the conditions to be determined by mutual agreement of the Requesting and Requested States. The time spent in custody in the territory of the Requesting State pending prosecution in that State may be deducted from the time remaining to be served in the Requested State.

**ARTICLE VIII: Extradition Procedure and Required Documents**

1. The request for extradition shall be made in writing and shall be transmitted, with supporting documents, through the diplomatic channel, which shall include transmission as provided for in paragraph 8 of this Article.

2. The request for extradition shall contain:

    (a) information which will help to establish the identity of the person sought;

5

(b) the location of the person if known or, if it is not known, a statement to that effect; and

(c) a brief statement of the facts of the case.

3. Every request for extradition shall be supported by documents which contain:

(a) as accurate a description as possible of the person sought, together with any other information which will assist in establishing the person's identity and nationality;

(b) a statement of the pertinent facts of the case, indicating as accurately as possible the time and place of commission of the offence; and

(c) the legal description of the offence and a statement of the maximum penalties therefor and the text of the law setting forth the offence or, where this is not possible, a statement of the relevant law.

4. When the request for extradition relates to a person who has not been convicted, it shall also be supported:

(a) by the original or an authenticated copy of the warrant of arrest, or equivalent order, issued by a competent authority of the Requesting State;

(b) by the original or an authenticated copy of the complaint, information or indictment; and

(c) in the case of a request emanating from Ireland, by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it.

5. When the request for extradition relates to a convicted person, it shall also be supported:

(a) by the original or an authenticated copy of the judgment of conviction; and

(b) if a sentence has been imposed, by the original or an authenticated copy of the sentence and a statement of the extent to which it has been carried out and that it is immediately enforceable.

6. All documents transmitted by the Requesting State shall be in English or shall be translated into English by that State.

7. Documents that bear the certificate or seal of the Department of Justice, or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalisation. "Department of Justice" shall, for the United States of America, mean the United States Department of Justice, and, for Ireland, the Department of Justice, Equality and Law Reform.

6

8. If the person whose extradition is sought is held under provisional arrest by the Requested State, the Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to paragraph 1 of this Article, by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under Article X of this Treaty to enable the person's continued detention.

## ARTICLE VIII *bis*:  Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

## ARTICLE IX:  Additional Evidence or Information

1. If the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall specify.

2. If the person sought is in custody and the additional evidence or information submitted as aforesaid is found insufficient or if such evidence or information is not received within the period specified by the Requested State, the person shall be discharged from custody. Such discharge shall not preclude the Requesting State from submitting another request in respect of the same offence.

3. Such additional evidence or information may be requested and furnished directly between the United States Department of Justice and the Department of Justice, Equality and Law Reform in Ireland.

## ARTICLE X:  Provisional Arrest

1. In case of urgency, a Contracting Party may request the provisional arrest of a person sought. The request for provisional arrest shall be made through the diplomatic channel or directly between the United States Department of Justice and the Department of Justice, Equality and Law Reform in Ireland, in which case the facilities of INTERPOL may be used. The request may be transmitted by post or telegraph or by any other means affording evidence in writing.

7

2. The request shall contain:

    (a) a description of the person sought;

    (b) a statement of the nature of the offence and of the time at which and the place where it is alleged to have been committed;

    (c) a statement of the existence of one of the documents referred to in paragraph 4(a) or 5 of Article VIII; and

    (d) a statement that it is intended to send a request for extradition.

3. On receipt of such a request, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its request.

4. Unless the law of the Requested State otherwise provides, a person arrested upon such a request shall be released upon the expiration of forty-five days from the date of that person's arrest if the request for extradition has not been duly received by the Requested State. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if a request for extradition is subsequently received.

### ARTICLE XI:  Rule of Speciality

1. A person extradited under this Treaty shall not be proceeded against, sentenced, punished, detained or otherwise restricted in his or her personal freedom in the Requesting State for an offence other than that for which extradition has been granted, or be extradited by that State to a third State, unless:

    (a) the person has left the Requesting State after extradition and has voluntarily returned to it;

    (b) the person, having had an opportunity to leave the Requesting State, has not done so within forty-five days of final discharge in respect of the offence for which that person was extradited; or

    (c) the Requested State has consented.

2. Where the description of the offence charged in the Requesting State is altered in the course of proceedings, the person extradited shall not be proceeded against, punished, detained or otherwise restricted in his or her personal freedom except insofar as the offence under its new description is composed of the same constituent elements as the offence for which extradition was granted.

3. Unless the law of the Requesting State otherwise provides, the person extradited may be proceeded against, sentenced, punished, detained or otherwise restricted in his or her

8

personal freedom for an offence for which that person could be convicted, under the law of that State, upon trial for the offence for which extradition was granted.

4. These stipulations shall not apply to offences committed after the extradition.

**ARTICLE XII: Multiple Requests**

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offence or for different offences, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2. If Ireland receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offence or for different offences, its High Court, or such other authority as it may subsequently designate, shall determine to which State, if any, the person is to be surrendered.

3. In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

    (a)      whether the requests were made pursuant to a treaty;
    (b)      the places where each of the offences was committed;
    (c)      the respective interests of the requesting States;
    (d)      the seriousness of the offences;
    (e)      the nationality of the victim;
    (f)      the citizenship or nationality of the person sought;
    (g)      the possibility of any subsequent extradition between the requesting States; and
    (h)      the chronological order in which the requests were received from the requesting States.

**ARTICLE XII *bis*: Simplified extradition procedures**

If the person sought consents to be surrendered to the Requesting State, the Requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of protection of the rule of specialty.

**ARTICLE XIII: Notification of Decision**

1. The Requested State shall promptly communicate to the Requesting State through the diplomatic channel the decision on the request for extradition.

9

2. The Requested State shall provide reasons for any partial or complete rejection of the request for extradition. It shall also provide the Requesting State with a copy of each opinion issued by its courts in connection with a request for extradition under this Treaty.

3. If a warrant or order for the extradition of a person sought has been issued by the competent authority and the person is not removed from the territory of the Requested State within such time as may be prescribed by the law of that State, that person may be set at liberty and the Requested State may subsequently refuse to extradite that person for that offence.

## ARTICLE XIV:  Surrender of Property

1. To the extent permitted under the law of the Requested State and subject to the rights of third parties, which shall be duly respected, all property which appears to have been acquired as a result of the offence in question or which may be required as evidence shall, if found, be seized and surrendered to the Requesting State if the person sought is extradited or if extradition, having been granted, cannot be carried out by reason of the death or escape of that person.

2. The Requested State may make the surrender of the property conditional upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable, and may defer its surrender if it is needed as evidence in the Requested State.

## ARTICLE XV:  Transit

1. Transit through the territory of one of the Contracting Parties of a person surrendered to the other Contracting Party by a third State may be granted on request subject to the law of the State of transit and to such conditions as that State may impose. For the purpose of considering the request, the State of transit may require the submission of such information as it considers necessary.

2. Authorisation is not required when air transportation is used and no landing is scheduled on the territory of the transit State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit that contains a description of the person being transported and a brief statement of the facts of the case. A request for transit shall be made through the diplomatic channel or directly between the United States Department of Justice and the Irish Department of Justice, Equality and Law Reform.  The facilities of the International Criminal Police Organisation (INTERPOL) may be used to transmit such a request. All measures necessary to prevent the person from absconding shall be taken until transit is effected, as long as the request for transit is received within 96 hours of the unscheduled landing.

10

**ARTICLE XVI: Representation**

1. The Department of Justice of the United States shall advise, assist and represent, or provide for the representation of, Ireland in any proceedings in the United States arising out of a request for extradition made by Ireland.

2. The Attorney General of Ireland shall advise and assist, and represent, or provide for the representation of, the interests of the United States in any proceedings in Ireland arising out of a request for extradition made by the United States.

3. The functions referred to in this Article may be assumed by any successor agency designated by the State concerned.

**ARTICLE XVII: Expenses**

1. The Requesting State shall bear all expenses arising out of the translation of documents and the transportation of the person sought from the place of the extradition proceedings to the Requesting State. Notwithstanding any law to the contrary, the Requested State shall bear all other expenses arising out of the request for extradition and the proceedings.

2. The Requested State shall make no pecuniary claim against the Requesting State arising out of the arrest, detention, extradition proceedings and surrender of a person sought under this Treaty.

**ARTICLE XVIII: Termination**

Either Contracting Party may terminate this Treaty by giving written notice to the other Contracting Party at any time, and the termination shall become effective six months after the date of receipt of such notice.

11

Ambasáid na hÉireann
Embassy of Ireland



Our Ref: 534/674

The Embassy of Ireland presents its compliments to the United States Department of State and has the honour to refer to the Treaty on Extradition between Ireland and the United States of America, done at Washington on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005, and on behalf of Ireland requests the extradition from the United States of America of Kevin Yungman, a citizen of the United States of America and of Argentina.

The said Kevin Yungman is wanted by the Irish authorities for prosecution in connection with the offence of rape contrary to section 48 of the Offences Against the Person Act, 1861 and Section 2 of the Criminal Law (Rape) Act, 1981 as amended by section 21 of the Criminal Law (Rape) Act, 1990.

In accordance with Article VIII of the aforesaid Treaty the following information and documents, in support of the request for extradition, are submitted herewith under the seal of the Minister for Foreign Affairs of Ireland:

- Information which will help to establish the identity of the person sought, his location, and a brief statement of the facts of the case, pursuant to Article VIII(2);

- as accurate a description as possible of the person sought, together with other information which will assist in establishing the person's identity and nationality, pursuant to Article VIII(3)(a);

- a statement of the pertinent facts of the case, indicating the time and place of commission of the offences, pursuant to Article VIII(3)(b);

- a legal description of the offence and a statement of the maximum penalties therefor, together with the text of the law setting forth the offence pursuant to Article VIII(3)(c);

- an authenticated copy of the arrest warrant, pursuant to Article VIII(4)(a);

- an authenticated copy of the information, pursuant to Article VIII(4)(b);

- a statement of facts, by way of affidavit setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it, pursuant to Article VIII(4)(c);

2234 Massachusetts Ave NW, Washington D.C. 20008, USA
T +1 202 462 3939 | washingtonembassy@dfa.ie
www.dfa.ie/usa
Follow us on Twitter @IrelandEmbUSA



# Ambasáid na hÉireann
Embassy of Ireland

The Embassy wishes to notify the United States Department of State that, pursuant to Article IX of the aforesaid Treaty, the Irish authorities are willing to provide additional material and supplementary information should this be required, including material and information relating to the documents contained in this request. In addition, the Irish authorities are prepared to make available police officers for the purpose of identification of the said Kevin Yungman and/or other officials for the purpose of giving Court evidence in the United States of America in relation to any matter arising by virtue of this request.

The Embassy attaches hereto a folder containing authenticated original documents under the seal of the Minister of Foreign Affairs for Ireland and three (3) copies of this folder.

The Embassy requests the United States Department of State to keep it informed of developments in relation to this request.

The Embassy of Ireland avails itself of this opportunity to renew to the United States Department of State the assurance of its highest consideration.

Embassy of Ireland                                                    6 July 2021
Washington



2234 Massachusetts Ave NW, Washington D.C. 20008, USA
T +1 202 462 3939 | washingtonembassy@dfa.ie
www.dfa.ie/usa
Follow us on Twitter @IrelandEmbUSA

EXT-YUNGMAN-00021

# IRELAND

**Treaty on Extradition between Ireland and the United States of America, done at Washington D.C. on 13 July 1983, as amended by the Instrument contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America signed on 25 June 2003, done at Dublin on 14 July 2005**

I, Hilary Boyle, Assistant Legal Adviser in the Department of Foreign Affairs, an officer of Ireland, hereby certify that the documents attached hereto have been prepared in support of the request for the extradition from the United States of America to Ireland of Kevin Yungman, a citizen of the United States of America and of Argentina.

I further certify that the seal affixed to this certificate is the seal of the Minister for Foreign Affairs of Ireland, a Minister of the Government of Ireland.

I further certify that the said seal duly authenticates all documents attached to this certificate, submitted in support of this request.

Signed and sealed at Dublin, this    28    day of June 2021

..............................................

A person authorised by law to
authenticate the Seal of the Minister
for Foreign Affairs of Ireland
pursuant to the Ministers and
Secretaries Act, 1924



Treaty on Extradition between the Ireland and the United States of
America done at Washington on the 13th of July 1983.

Request by the Irish Authorities for the Extradition from the United States
of America of Kevin Yungman, a citizen of the United States of America
and Argentina

<u>INDEX</u>

Part 1: Information required pursuant to Article VIII Paragraph 2 of the Treaty on Extradition between Ireland and the United States of America.

Part 2: Documents containing information required pursuant to Article VIII paragraph 3 of the Treaty on Extradition between Ireland and the United States of America.

Part 3: Material required pursuant to Article VIII Paragraph 4 of the Treaty on Extradition between Ireland and the United States of America.

**Part 1: Information required pursuant to Article VIII Paragraph 2 of the Treaty on Extradition between Ireland and the United States of America.**

(a)  Information which will help to establish the identity of the person sought.

(b)  The location of the person sought.

(c)  A brief statement of the facts of the case.

3

(a) Information which will help to establish the identity of the person sought.

Name :        Kevin Yungman

Born :        8th September 1992

Address :     750 Heritage Drive, Weston, Florida, 33326, United States of America

Please see photograph attached.

Height:       1.75 meters/5 feet 9 inches

Build:        Fit and strong

Hair:         Black

Eyes:         Brown

4

| Name: | Kevin Yungman |
|---|---|
| DOB: | 08/09/1992 |
| Date and location of Photograph: | 06/06/2018, Kevin Street Garda Station |



I certify that this is a photograph of Kevin Yungman, taken in police custody.

_____ Sgt
(James A. Kirwan)



XT-YUNGMAN-00028











We hold these truths to be self-evident, that all men are
with certain unalienable rights, that among these
Visas
10

**(b) The location of the person sought.**

750 Heritage Drive, Weston, Florida, 33326 United States of America

5

**(c) A brief statement of the facts of the case.**

It is alleged that between the 04th June 2018 and the 05th June 2018, that Kevin Yungman, the requested person, raped Vivian Marques de Sousa, the injured party, at Apartment 104, Viking Harbour Apartments, Dublin 8. Prior to the alleged rape both parties had been in a brief, consensual sexual relationship. The alleged rape occurred when both the requested person and the injured party were present in Apartment 104, Viking Harbour Apartments on 4th June 2018. The requested person allegedly committed the offence of rape in the bedroom of the apartment while asphyxiating the injured party to the point that she lost consciousness and then penetrated her vagina with his penis without her consent. When she regained consciousness, the injured party alleges that the requested person engaged in sexual intercourse with her and that she asked him to stop but that he did not do so.

The Director of Public Prosecutions directed on 13th of February 2020 that the requested person should be charged with rape. A person convicted of the offence of rape is liable to the maximum sentence of life imprisonment.

**Part 2: Documents containing information required pursuant to Article VIII Paragraph 3 of the Treaty on Extradition between Ireland and the United States of America.**

(a) As accurate a description as possible of the person sought together with information, which will assist in establishing the person's identity and nationality.

(b) A statement of the pertinent facts of the case indicating the time and place of commission of the offences.

(c) The legal description of the offences and statements of the relevant laws and maximum penalties therefor, texts of the law and a statement of the relevant Law.

7

(a) As accurate, a description as possible of the person sought together with information, which will assist in establishing the person's identity and nationality.

Please see details contained in part 1(a) of this extradition request.

8

**(b) A statement of the pertinent facts of the case indicating the time and place of commission of the offences.**

**It is alleged:**

Vivian Marques de Sousa, the injured party, is a Brazilian National who entered Ireland in March 2017. She travelled to Paris, France on the 7th of April 2018 where she first met Mr. Yungman, the requested person. They spent two days together in Paris before she returned to Ireland on the 9th of April, 2018. She maintained contact with him. He arrived in Dublin Airport on the 3rd of June 2018.

**Location**

The injured party had booked an Air B&B at 104 Viking Harbour Apartments, Dublin 8 for three nights. This is where the alleged rape happened.

**Rape**

The Injured Party and Requested Person spent the next day on a day trip to County Clare. Following their return to the apartment on 4th of June, 2018 both parties moved to the bedroom of the apartment and it is alleged that while on the bed, the requested person placed both his hands around her neck to physically restrain the injured party until she lost consciousness, he then allegedly penetrated her vagina with his penis without her consent. On regaining consciousness, the injured party alleges that the requested person engaged in sexual intercourse with her and that she asked him to stop but he didn't and she was unable to stop him. She was on her left side and he inserted his penis fully into her vagina. They parted company on the 5th of June, 2018 and a complaint was made on that date to the Garda Siochana (police service of Ireland) by the injured party in relation to the actions of the requested person. She showed the Garda Siochana a *WhatsApp* message received by her from the requested person on the day she last spoke to him in which he apologised, stating "know that nothing like this will ever happen again."

**Arrest**

The requested person was arrested at 10:35AM on the 6th of June 2018 at Dublin Airport as he attempted to board a flight. The requested person is a United States national, holding both an American and an Argentinian passport. He was interviewed twice while in custody in Kevin Street Garda Station on the 6th of June, 2018. He stated that sexual intercourse was consensual throughout.

**Directions**

The Director of Public Prosecutions directed on 13th of February 2020 that the requested person should be charged with rape as follows:

9

(b) A statement of the pertinent facts of the case indicating the time and
   place of commission of the offences.

It is alleged:
Vivian Marques de Sousa, the injured party, is a Brazilian National who entered
Ireland in March 2017. She travelled to Paris, France on the 7th of April 2018
where she first met Mr. Yungman, the requested person. They spent two days
together in Paris before she returned to Ireland on the 9th of April, 2018. She
maintained contact with him. He arrived in Dublin Airport on the 3rd of June
2018.

Location
The injured party had booked an Air B&B at 104 Viking Harbour Apartments,
Dublin 8 for three nights. This is where the alleged rape happened.

Rape
The Injured Party and Requested Person spent the next day on a day trip to
County Clare. Following their return to the apartment on 4th of June, 2018 both
parties moved to the bedroom of the apartment and it is alleged that while on the
bed, the requested person placed both his hands around her neck to physically
restrain the injured party until she lost consciousness, he then allegedly
penetrated her vagina with his penis without her consent. On regaining
consciousness, the injured party alleges that the requested person engaged in
sexual intercourse with her and that she asked him to stop but he didn't and she
was unable to stop him. She was on her left side and he inserted his penis fully
into her vagina. They parted company on the 5th of June, 2018 and a complaint
was made on that date to the Garda Siochana (police service of Ireland) by the
injured party in relation to the actions of the requested person. She showed the
Garda Siochana a *WhatsApp* message received by her from the requested person
on the day she last spoke to him in which he apologised, stating "know that
nothing like this will ever happen again."

Arrest
The requested person was arrested at 10:35AM on the 6th of June 2018 at
Dublin Airport as he attempted to board a flight. The requested person is a
United States national, holding both an American and an Argentinian passport.
He was interviewed twice while in custody in Kevin Street Garda Station on the
6th of June, 2018. He stated that sexual intercourse was consensual throughout.

Directions
The Director of Public Prosecutions directed on 13th of February 2020 that the
requested person should be charged with rape as follows:

9

*'Between the 04th June 2018 and the 05th June 2018, both dates inclusive at Apartment 104, Viking Harbour Apartments, Dublin 8 in said Dublin Metropolitan District, did rape one Vivian Marques de Sousa, a female person. Contrary to Section 48 Offences Against the Person Act, 1861 and Section 2 of the Criminal Law (Rape) Act, 1981 as amended by section 21 of the Criminal Law (Rape) Act, 1990'.*

The requested person has yet to be charged as he has left the jurisdiction.

(c) **The legal description of the offences and statements of the relevant laws and maximum penalties therefor, texts of the law and a statement of the relevant Law.**

Rape is a statutory offence under Irish Law.

Section 2 of the Criminal Law (Rape) (Amendment) Act 1981 provides as follows:

Meaning of "rape".

2.—(1) A man commits rape if—
(a) he has sexual intercourse with a woman who at the time of the intercourse does not consent to it, and
(b) at that time he knows that she does not consent to the intercourse or he is reckless as to whether she does or does not consent to it,
and references to rape in this Act and any other enactment shall be construed accordingly.
(2) It is hereby declared that if at a trial for a rape offence the jury has to consider whether a man believed that a woman was consenting to sexual intercourse, the presence or absence of reasonable grounds for such a belief is a matter to which the jury is to have regard, in conjunction with any other relevant matters, in considering whether he so believed.

Section 48 of the Offences Against the Person Act 1861 is also relevant it provides as follows:

'Whosoever shall be convicted of the Crime of Rape shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour'.

Section 63 of the Offences Against The Person Act 1861 provides "whenever, on the trial for any offence punishable under this Act, (which includes rape under Section 48) it may be necessary to prove carnal knowledge, it shall not be necessary to prove the actual emission of seed in order to constitute a carnal knowledge but shall be deemed complete upon proof of penetration only."

Section 48 of the Offences Against the Person Act 1861 provides that the maximum penalty for rape is life imprisonment.

11

Section 21 of the Criminal Law (Rape) (Amendment) Act, 1990

repealed enactments specified in column (3) of the Schedule to that Act to the extent specified in column (4) of that Schedule.  Section 21 of the 1990 Act repealed the word "unlawful" from Section 2(1)(a) of 1981 Criminal Law (Rape) (Amendment) Act 1981 where it appeared before the words "sexual intercourse".  It did not affect the above provisions apart from this repeal.

Please see text of law attached.

12



---

*Number 32 of* 1990

---

## CRIMINAL LAW (RAPE) (AMENDMENT) ACT, 1990

---

ARRANGEMENT OF SECTIONS

Section

1. Interpretation.

2. Sexual assault.

3. Aggravated sexual assault.

4. Rape under *section 4.*

5. Abolition of marital exemption in relation to rape.

6. Capacity to commit offences of a sexual nature.

7. Corroboration of evidence in proceedings in relation to offences of a sexual nature.

8. Alternative verdicts.

9. Consent.

10. Trial of persons for certain offences by Central Criminal Court.

11. Exclusion of the public from hearings.

---

BAILE ÁTHA CLIATH:
ARNA FHOILSIÚ AG OIFIG AN tSOLÁTHAIR.

Le ceannach díreach ón
OIFIG DHÍOLTA FOILSEACHÁN RIALTAIS, TEACH SUN ALLIANCE,
SRÁID THEACH LAIGHEAN, BAILE ÁTHA CLIATH 2,
nó trí aon díoltóir leabhar.

---

DUBLIN:
PUBLISHED BY THE STATIONERY OFFICE.

---

To be purchased through any Bookseller, or directly from the
GOVERNMENT PUBLICATIONS SALE OFFICE, SUN ALLIANCE HOUSE,
MOLESWORTH STREET, DUBLIN 2.

---

£1.80

[1990.] *Criminal Law (Rape) (Amendment)* [*No. 32.*]
*Act, 1990*

Section

12. Amendment of section 1 of Principal Act.

13. Amendment of section 3 of Principal Act.

14. Amendment of section 8 of Principal Act.

15. Amendment of section 9 of Principal Act.

16. Amendment of section 12 of Principal Act.

17. Miscellaneous amendments of Principal Act.

18. Amendment of section 18 of Criminal Law Amendment Act, 1935.

19. Amendment of Defence Act, 1954.

20. Amendment of Criminal Procedure Act, 1967.

21. Repeals.

22. Short title, collective citation, construction, commencement and transitional provision.

SCHEDULE

ENACTMENTS REPEALED

ACTS REFERRED TO

| | |
|---|---|
| Criminal Justice Act, 1951 | 1951, No. 2 |
| Criminal Law Amendment Act, 1885 | 1885, c. 69 |
| Criminal Law Amendment Act, 1935 | 1935, No. 6 |
| Criminal Law (Rape) Act, 1981 | 1981, No. 10 |
| Criminal Procedure Act, 1967 | 1967, No. 12 |
| Defence Act, 1954 | 1954, No. 18 |
| Genocide Act, 1973 | 1973, No. 28 |
| Offences against the Person Act, 1861 | 1861, c. 100 |



*Number* 32 *of* 1990

CRIMINAL LAW (RAPE) (AMENDMENT) ACT, 1990

AN ACT TO AMEND THE LAW RELATING TO RAPE AND
CERTAIN OTHER SEXUAL OFFENCES AND FOR THAT
5     PURPOSE TO AMEND THE CRIMINAL LAW (RAPE)
ACT, 1981, AND CERTAIN OTHER ENACTMENTS.
[18*th December,* 1990]

BE IT ENACTED BY THE OIREACHTAS AS FOLLOWS:

**1.**—(1) In this Act—                                    Interpretation.

10  "aggravated sexual assault" has the meaning assigned to it by *section 3*;

"rape under *section 4*" has the meaning assigned to it by *section 4*;

"the Principal Act" means the Criminal Law (Rape) Act, 1981;

"sexual assault" has the meaning assigned to it by *section 2*.

15   (2) (*a*) In this Act and in the Principal Act a reference to a section is a reference to a section of the Act in which the reference occurs unless it is indicated that reference to some other enactment is intended.

(*b*) In this Act and in the Principal Act a reference to a
20         subsection, paragraph or subparagraph is a reference to the subsection, paragraph or subparagraph of the provision in which the reference occurs unless it is indicated that reference to some other provision is intended.

(*c*) In this Act and in the Principal Act a reference to any
25         enactment shall be construed as a reference to that enactment as amended or adapted by or under any subsequent enactment.

**2.**—(1) The offence of indecent assault upon any male person and   Sexual assault.
the offence of indecent assault upon any female person shall be known
30  as sexual assault.

(2) A person guilty of sexual assault shall be liable on conviction
on indictment to imprisonment for a term not exceeding 5 years.

3

(3) Sexual assault shall be a felony.

**Aggravated sexual assault.**

**3.**—(1) In this Act "aggravated sexual assault" means a sexual assault that involves serious violence or the threat of serious violence or is such as to cause injury, humiliation or degradation of a grave nature to the person assaulted.

5

(2) A person guilty of aggravated sexual assault shall be liable on conviction on indictment to imprisonment for life.

(3) Aggravated sexual assault shall be a felony.

**Rape under *section 4*.**

**4.**—(1) In this Act "rape under *section 4*" means a sexual assault that includes—

10

(a) penetration (however slight) of the anus or mouth by the penis, or

(b) penetration (however slight) of the vagina by any object held or manipulated by another person.

(2) A person guilty of rape under *section 4* shall be liable on conviction on indictment to imprisonment for life.

15

(3) Rape under *section 4* shall be a felony.

**Abolition of marital exemption in relation to rape.**

**5.**—(1) Any rule of law by virtue of which a husband cannot be guilty of the rape of his wife is hereby abolished.

(2) Criminal proceedings against a man in respect of the rape by him of his wife shall not be instituted except by or with the consent of the Director of Public Prosecutions.

20

**Capacity to commit offences of a sexual nature.**

**6.**—Any rule of law by virtue of which a male person is treated by reason of his age as being physically incapable of committing an offence of a sexual nature is hereby abolished.

25

**Corroboration of evidence in proceedings in relation to offences of a sexual nature.**

**7.**—(1) Subject to any enactment relating to the corroboration of evidence in criminal proceedings, where at the trial on indictment of a person charged with an offence of a sexual nature evidence is given by the person in relation to whom the offence is alleged to have been committed and, by reason only of the nature of the charge, there would, but for this section, be a requirement that the jury be given a warning about the danger of convicting the person on the uncorroborated evidence of that other person, it shall be for the judge to decide in his discretion, having regard to all the evidence given, whether the jury should be given the warning; and accordingly any rule of law or practice by virtue of which there is such a requirement as aforesaid is hereby abolished.

30

35

(2) If a judge decides, in his discretion, to give such a warning as aforesaid, it shall not be necessary to use any particular form of words to do so.

40

**Alternative verdicts.**

**8.**—(1) A person indicted for rape may, if the evidence does not warrant a conviction for rape but warrants a conviction for rape under *section 4* or aggravated sexual assault or sexual assault, be found

4

guilty of rape under *section 4* or of aggravated sexual assault or of sexual assault, as may be appropriate.

(2) A person indicted for rape may, if the evidence does not warrant a conviction for rape but warrants a conviction for an offence 5 under section 1 or 2 of the Criminal Law Amendment Act, 1935, or under section 3 of the Criminal Law Amendment Act, 1885, be found guilty of an offence under the said section 1, 2 or 3, as may be appropriate.

(3) A person indicted for rape under *section 4* may, if the evidence 10 does not warrant a conviction for rape under *section 4* but warrants a conviction for aggravated sexual assault or for sexual assault, be found guilty of aggravated sexual assault or of sexual assault, as may be appropriate.

(4) A person indicted for aggravated sexual assault may, if the 15 evidence does not warrant a conviction for aggravated sexual assault but warrants a conviction for sexual assault, be found guilty of sexual assault.

(5) A person indicted for an offence made felony by section 1 of the Criminal Law Amendment Act, 1935, may, if the evidence does 20 not warrant a conviction for the felony or an attempt to commit the felony but warrants a conviction for an offence under section 2 of the Criminal Law Amendment Act, 1935, or section 3 of the Criminal Law Amendment Act, 1885, or rape under *section 4* or aggravated sexual assault or sexual assault, be found guilty of an offence under 25 the said section 2 or 3 or of rape under *section 4* or of aggravated sexual assault or of sexual assault, as may be appropriate.

**9.**—It is hereby declared that in relation to an offence that consists | Consent.
of or includes the doing of an act to a person without the consent of
that person any failure or omission by that person to offer resistance
30 to the act does not of itself constitute consent to the act.

**10.**—A person indicted for a rape offence or the offence of aggra- | Trial of persons for
vated sexual assault or attempted aggravated sexual assault or of | certain offences by
aiding, abetting, counselling or procuring the offence of aggravated | Central Criminal
sexual assault or attempted aggravated sexual assault or of incite- | Court.
35 ment to the offence of aggravated sexual assault or conspiracy to commit
any of the foregoing offences shall be tried by the Central Criminal
Court.

**11.**—The following section shall be substituted for section 6 of the | Exclusion of the
Principal Act: | public from
| hearings.

40     "**6.**—(1) Subject to subsections (2), (3) and (4), in any pro-
ceedings for a rape offence or the offence of aggravated sexual
assault or attempted aggravated sexual assault or of aiding,
abetting, counselling or procuring the offence of aggravated
sexual assault or attempted aggravated sexual assault or of incite-
45 ment to the offence of aggravated sexual assault or conspiracy to
commit any of the foregoing offences, the judge, the justice or
the court, as the case may be, shall exclude from the court during
the hearing all persons except officers of the court, persons
directly concerned in the proceedings, *bona fide* representatives
50 of the Press and such other persons (if any) as the judge, the
justice or the court, as the case may be, may in his or its discretion
permit to remain.

(2) Subject to subsection (3), during the hearing of an application under section 3 (including that section as applied by section 5) or under section 4 (2), the judge, the justice or the court, as the case may be, shall exclude from the court all persons except officers of the court and persons directly concerned in the proceedings.  5

(3) Subsections (1) and (2) are without prejudice to the right of a parent, relative or friend of the complainant or, where the accused is not of full age, of the accused to remain in court.

(4) In any proceedings to which subsection (1) applies the  10
verdict or decision and the sentence (if any) shall be announced in public.".

Amendment of
section 1 of
Principal Act.

**12.**—Section 1 of the Principal Act is hereby amended by the substitution of the following subsection for subsection (1):

"(1) In this Act—  15

'aggravated sexual assault', 'rape under *section 4*' and 'sexual assault' have the meanings respectively assigned to them by the *Criminal Law (Rape) (Amendment) Act, 1990*;

'complainant' means a person in relation to whom a sexual assault offence is alleged to have been committed;  20

'a rape offence' means any of the following, namely, rape, attempted rape, burglary with intent to commit rape, aiding, abetting, counselling and procuring rape, attempted rape or burglary with intent to commit rape, and incitement to rape and, other than in sections 2 (2) and 8 of this Act, rape under *section*  25
*4*, attempted rape under *section 4*, aiding, abetting, counselling and procuring rape under *section 4* or attempted rape under *section 4* and incitement to rape under *section 4*;

'a sexual assault offence' means a rape offence and any of the following, namely, aggravated sexual assault, attempted aggra-  30
vated sexual assault, sexual assault, attempted sexual assault, aiding, abetting, counselling and procuring aggravated sexual assault, attempted aggravated sexual assault, sexual assault or attempted sexual assault, incitement to aggravated sexual assault or sexual assault and conspiracy to commit any of the foregoing  35
offences.".

Amendment of
section 3 of
Principal Act.

**13.**—Section 3 of the Principal Act is hereby amended by the substitution of the following subsection for subsection (1):

"(1) If at a trial any person is for the time being charged with a sexual assault offence to which he pleads not guilty, then,  40
except with the leave of the judge, no evidence shall be adduced and no question shall be asked in cross-examination at the trial, by or on behalf of any accused person at the trial, about any sexual experience (other than that to which the charge relates) of a complainant with any person; and in relation to a sexual  45
assault tried summarily pursuant to section 12—

    (*a*) subsection (2) (*a*) shall have effect as if the words 'in the absence of the jury' were omitted,

    (*b*) subsection (2) (*b*) shall have effect as if for the references

*Act,* 1990.

to the jury there were substituted references to the court, and

5    (*c*) this section (other than this paragraph) and subsections (3) and (4) of section 7 shall have effect as if for the references to the judge there were substituted references to the court.".

14.—Section 8 of the Principal Act is hereby amended—    <span style="float:right">Amendment of section 8 of Principal Act.</span>

(*a*) by the substitution of the following subsection for subsection (2):

10    "(2) If a person charged with a rape offence applies in that behalf to a judge of the High Court before the commencement of the trial or to the judge at the trial, the judge shall direct that subsection (1) shall not apply to the person in relation to the charge:

15    Provided that, if it appears to the judge that, if the direction were given, the publication of any matter in pursuance of the direction might enable members of the public to identify a person as the complainant in relation to the charge, the judge shall not give the direction
20    unless he is satisfied that a direction could properly be given in relation to that person in pursuance of section 7.",

and

(*b*) by the insertion of the following subsection after subsection
25    (7):

"(8) If, at any time after a person is charged with a rape offence, the Director of Public Prosecutions applies in that behalf to a judge of the High Court, the judge, if he is satisfied that it is in the public interest to do so,
30    shall direct that subsection (1) shall not apply to such matter relating to the person charged with the offence as is specified in the direction.".

15.—Section 9 (2) of the Principal Act is hereby amended by the    <span style="float:right">Amendment of section 9 of Principal Act.</span>
insertion after paragraph (*a*) of the following paragraph:

35    "(*aa*) in section 8 (8) for the reference to the Director of Public Prosecutions there shall be substituted a reference to the convening authority and for the references to a judge of the High Court there shall be substituted references to a superior authority; and,
40    for the purposes of this paragraph, each of the following shall be a superior authority:

(i) the Minister for Defence,

(ii) the Adjutant-General of the Defence Forces,

45    (iii) any general officer or flag officer (within the meaning, in each case, of the Defence Act, 1954) appointed by the Minister for Defence for the purpose, and".

Amendment of
section 12 of
Principal Act.

**16.**—Section 12 (1) of the Principal Act is hereby amended by—

(a) the substitution of "a sexual assault or an offence to which
section 11 relates" for "an offence to which section 10 or
11 relates", and

(b) the substitution of "£1,000" for "£500".                      5

Miscellaneous
amendments of
Principal Act.

**17.**—(1) Sections 4 (1), 5 and 9 (1) of the Principal Act are hereby
amended by the substitution of "sexual assault offence" for "rape
offence".

(2) Section 7 of the Principal Act is hereby amended by—

(a) the substitution of "person" for "woman" in subsection (1),   10
and

(b) the substitution of "the outcome of" for "an acquittal of the
accused person at" in subsection (4), and

(c) the substitution of "sexual assault offence" for "rape offence"
in subsections (1), (2), (3), (4), (5), (8) (a) and (10).         15

Amendment of
section 18 of
Criminal Law
Amendment Act,
1935.

**18.**—Section 18 of the Criminal Law Amendment Act, 1935, is
hereby amended by the substitution of "£500" for "two pounds" and
"6 months or to both" for "one month".

Amendment of
Defence Act, 1954.

**19.**—The Defence Act, 1954, is hereby amended by—

(a) the insertion in section 169 (b), after "rape", of ", rape under   20
*section 4* (within the meaning of the *Criminal Law (Rape)
(Amendment) Act, 1990*) or aggravated sexual assault
(within the meaning of the *Criminal Law (Rape) (Amend-
ment) Act, 1990*)", and

(b) the substitution in section 192 (3) of ", rape , rape under   25
*section 4* (within the meaning of the *Criminal Law (Rape)
(Amendment) Act, 1990*) or aggravated sexual assault
(within the meaning of the *Criminal Law (Rape) (Amend-
ment) Act, 1990*)" for "or rape".

Amendment of
Criminal
Procedure Act,
1967.

**20.**—(a) Paragraph (a) of subsection (2) of section 13 of the Crimi-   30
nal Procedure Act, 1967, shall not apply in relation to
rape, rape under *section 4* (within the meaning of the
*Criminal Law (Rape) (Amendment) Act, 1990*) or aggra-
vated sexual assault (within the meaning of the *Criminal
Law (Rape) (Amendment) Act, 1990*).                              35

(b) Notwithstanding *paragraph (a)*, the offences referred to
therein shall be deemed, for the purposes of paragraph
(b) of the said subsection (2), to be offences to which
the said section 13 applies.

Repeals.

**21.**—The enactments specified in *column (3)* of the Schedule to this   40
Act are hereby repealed to the extent specified in *column (4)* of that
Schedule.

[1990.] *Criminal Law (Rape) (Amendment), [No. 32.]*
*Act, 1990.*

22.—(1) This Act may be cited as the Criminal Law (Rape) (Amendment) Act, 1990.

(2) The Criminal Law (Rape) Act, 1981, and this Act may be cited together as the Criminal Law (Rape) Acts, 1981 and 1990, and shall be construed together as one.

(3) This Act shall come into operation one month after the date of its passing.

(4) (a) Sections *2, 3, 4, 5, 6, 8, 12, 16, 19* and *21* (insofar as it relates to *reference numbers 3* and *4* in the Schedule to this Act) shall not have effect in relation to an offence committed before the commencement of this Act.

(b) Sections *7, 11, 13, 15* and *17 (1)* shall not have effect in relation to a trial or preliminary examination that begins before such commencement.

(c) (i) Subject to *subparagraph (ii), section 10* shall not have effect in relation to a case in which, before such commencement, a person has been sent forward for trial to the Circuit Court.

(ii) In a case to which *subparagraph (i)* applies, an application by a person charged or the Director of Public Prosecutions, made before the commencement of the trial concerned, to a judge of the Circuit Court sitting in the circuit where it is to take place for its transfer to the Central Criminal Court shall be granted.

(d) Section *20* shall not have effect in relation to a charge that is made before such commencement.

*Short title, collective citation, construction, commencement and transitional provision.*

SCHEDULE

*Section 21.*

ᴇɴᴀᴄᴛᴍᴇɴᴛꜱ ʀᴇᴘᴇᴀʟᴇᴅ

| Reference Number | Session and Chapter or Number and Year | Short Title | Extent of Repeal |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| 1 | 24 & 25 Vic., c. 100 | Offences against the Person Act, 1861 | In section 62, the words ", or of any indecent assault upon any male person". |
| 2 | 48 & 49 Vic., c. 69 | Criminal Law Amendment Act, 1885 | Section 9. |
| 3 | 1935, No. 6 | Criminal Law Amendment Act, 1935 | Section 3. |
| 4 | 1951, No. 2 | Criminal Justice Act, 1951 | In the First Schedule, the matter at reference number 6. |

9

[1990.] *Criminal Law (Rape) (Amendment)* [No. 32.]
*Act, 1990.*

| Reference Number (1) | Session and Chapter or Number and Year (2) | Short Title (3) | Extent of Repeal (4) |
|---|---|---|---|
| 5 | 1981, No. 10 | Criminal Law (Rape) Act, 1981 | In section 1 (3), the words "but this does not affect any rule of law by virtue of which a male person is treated by reason of his age as being incapable of committing an offence of any particular kind"; In section 2 (1) (*a*), the word "unlawful"; In section 8 (3), the words "or the Circuit Court"; Section 10; Section 12 (3). |

Wt. P24956/A/1. 2,750. 1/91. Cahill. (A23555). G.16.

10

# Offences Against The Person Act, 1861

OFFENCES AGAINST THE PERSON ACT 1861

CHAPTER C.

An Act to consolidate and amend the Statute Law of England and Ireland relating to Offences against the Person.[1] [6th August 1861.]

[*Preamble.*]

*Homicide.*

**Murder.**
**1.** Whosoever shall be convicted of murder shall suffer death as a felon.

**Sentence for murder.**
**2.** Upon every conviction for murder the court shall pronounce sentence of death, and the same may be carried into execution, and all other proceedings upon such sentence and in respect thereof may be had and taken, in the same manner in all respects as sentence of death might have been pronounced and carried into execution, and all other proceedings thereupon and in respect thereof might have been had and taken, before the passing of this Act, upon a conviction for any other felony for which the prisoner might have been sentenced to suffer death as a felon.

**Body to be buried in prison.**
**3.** The body of every person executed for murder shall be buried within the precincts of the prison in which he shall have been last confined after conviction, and the sentence of the court shall so direct.

**Conspiring or soliciting to commit murder.**
**4.** All persons who shall conspire, confederate, and agree to murder any person, whether he be a subject of Her Majesty or not, and whether he be within the Queen's dominions or not, and whosoever shall solicit, encourage, persuade, or endeavour to persuade, or shall propose to any person, to murder any other person, whether he be a subject of Her Majesty or not, and whether he be within the Queen's dominions or not, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude for any term not more than ten . . . years . . .

**Manslaughter.**
**5.** Whosoever shall be convicted of manslaughter shall be liable, at the discretion of the court, to be kept in penal servitude for life . . . or to pay such fine as the court shall award, in addition to or without any such other discretionary punishment as aforesaid.

murder or manslaughter, it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused; but it shall be sufficient in any indictment for murder to charge that the defendant did feloniously, wilfully, and of his malice aforethought kill and murder the deceased; and it shall be sufficient in any indictment for manslaughter to charge that the defendant did feloniously kill and slay the deceased; and it shall be sufficient in any indictment against any accessory to any murder or manslaughter to charge the principal with the murder or manslaughter (as the case may be) in the manner herein-before specified, and then to charge the defendant as an accessory in the manner heretofore used and accustomed.

**Excusable homicide.** **7.** No punishment or forfeiture shall be incurred by any person who shall kill another by misfortune or in his own defence, or in any other manner without felony.

**Petit treason. 9 Geo. 4. c. 31.** **8.** Every offence which before the commencement of the [¹] Act of the ninth year of King George the Fourth, chapter thirty-one, would have amounted to petit treason, shall be deemed to be murder only, and no greater offence; and all persons guilty in respect thereof, whether as principals or as accessories, shall be dealt with, indicted, tried, and punished as principals and accessories in murder.

**Murder or manslaughter abroad.** **9.** Where any murder or manslaughter shall be committed on land out of the United Kingdom, whether within the Queen's dominions or without, and whether the person killed were *a subject of Her Majesty or not*, every offence committed by *any subject of Her Majesty* in respect of any such case, whether the same shall amount to the offence of murder or of manslaughter, or of being accessory to murder or manslaughter, may be dealt with, inquired, of, tried, determined, and punished in any county or place *in England or Ireland* in which such person shall be apprehended or be in custody, in the same manner in all respects as if such offence had been actually committed in that county or place: Provided, that nothing herein contained shall prevent any person from being tried in any place out of *England or Ireland* for any murder or manslaughter committed out of *England or Ireland*, in the same manner as such person might have been tried before the passing of this Act.

**Provision for the trial of murder and manslaughter where the death or cause of death only happens in England or Ireland.** **10.** Where any person being feloniously stricken, poisoned, or otherwise hurt upon the sea, or at any place out of England or Ireland, shall die of such stroke, poisoning, or hurt in England or Ireland, or, being feloniously stricken, poisoned, or otherwise hurt in any place in England or Ireland, shall die of such stroke, poisoning, or hurt upon the sea, or at any place out of England or Ireland, every offence committed in respect of any such case, whether the same shall amount to the offence of murder or of manslaughter, or of being accessory to murder or manslaughter, may be dealt with, inquired of, tried, determined, and punished in the county or place in England or Ireland in which such death, stroke, poisoning, or hurt shall happen, in the same manner in all respects as if such offence had been wholly committed in that county or place.

**Administering poison, or wounding, with intent to murder.**    11. Whosoever shall administer to or cause to be administered to or to be taken by any person any poison or other destructive thing, or shall by any means whatsoever wound or cause any grievous bodily harm to any person, with intent in any of the cases aforesaid to commit murder, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

**Destroying or damaging a building with gunpowder, with intent to murder.**    12. Whosoever, by the explosion of gunpowder or other explosive substance, shall destroy or damage any building, with intent to commit murder, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

**Setting fire to or casting away a ship, with intent to murder.**    13. Whosoever shall set fire to any ship or vessel, or any part thereof, or any part of the tackle, apparel, or furniture thereof, or any goods or chattels being therein, or shall cast away or destroy any ship or vessel, with intent in any of such cases to commit murder, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

**Attempting to administer poison, or shooting or attempting to shoot, or attempting to drown, &c., with intent to murder.**    14. Whosoever shall attempt to administer to or shall attempt to cause to be administered to or to be taken by any person any poison or other destructive thing, or shall shoot at any person, or shall, by drawing a trigger or in any other manner, attempt to discharge any kind of loaded arms at any person, or shall attempt to drown, suffocate, or strangle any person, with intent, in any of the cases aforesaid, to commit murder, shall, whether any bodily injury be effected or not, be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

**By any other means attempting to commit murder.**    15. Whosoever shall, by any means other than those specified in any of the preceding sections of this Act, attempt to commit murder, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

*Letters threatening to murder.*

threatening to murder.

received, knowing the contents thereof, any letter or writing threatening to kill or murder any person, shall be guilty of felony, and being convicted thereof shall be liable, at the discretion of the court, to be kept in penal servitude for any term not exceeding ten years, . . . or to be imprisoned, . . . and, if a male under the age of sixteen years, with or without whipping.

*Acts causing or tending to cause Danger to Life or Bodily Harm.*

Impeding a person endeavouring to save himself or another from ship-wreck.

**17.** Whosoever shall unlawfully and maliciously prevent or impede any person, being on board of or having quitted any ship or vessel which shall be in distress, or wrecked, stranded, or cast on shore, in his endeavour to save his life, or shall unlawfully and maliciously prevent or impede any person in his endeavour to save the life of any such person as in this section first aforesaid, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

Shooting or attempting to shoot, or wounding, with intent to do grievous bodily harm, or to resist apprehension.

**18.** Whosoever shall unlawfully and maliciously by any means whatsoever wound or cause any grievous bodilyharm to any person, or shoot at any person, or, by drawing a trigger or in any other manner attempt to discharge any kind of loaded arms at any person, with intent, in any of the cases aforesaid, to maim, disfigure, or disable any person, or to do some other grievous bodily harm to any person, or with intent to resist or prevent the lawful apprehension or detainer of any person, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

What shall constitute loaded arms.

**19.** Any gun, pistol, or other arms which shall be loaded in the barrel with gunpowder or any other explosive substance, and ball, shot, slug, or other destructive material, shall be deemed to be loaded arms within the meaning of this Act, although the attempt to discharge the same may fail from want of proper priming or from any other cause.

Inflicting bodily injury, with or without weapon.

**20.** Whosoever shall unlawfully and maliciously wound or inflict any grievous bodily harm upon any other person, either with or without any weapon or instrument, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude . .

Attempting to choke, &c., in order to commit or assist in the committing of any indictable offence.

**21.** Whosoever shall, by any means whatsoever, attempt to choke, suffocate, or strangle any other person, or shall by any means calculated to choke, suffocate, or strangle, attempt to render any other person insensible, unconscious, or incapable of resistance, with intent in any of such cases thereby to enable himself or any other person to commit, or with intent in any of such cases thereby to assist any other person in committing, any indictable offence, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

| | |
|---|---|
| chloroform,<br>&c., to commit<br>or assist in the<br>committing of<br>any indictable<br>offence. | to apply or administer to or attempt to cause to be administered to or taken by, any person, any chloroform, laudanum, or other stupefying or overpowering drug, matter, or thing, with intent in any of such cases thereby to enable himself or any other person to commit, or with intent in any of such cases thereby to assist any other person in committing, any indictable offence, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . . |
| Maliciously<br>administering<br>poison, &c. so<br>as to endanger<br>life or inflict<br>grievous bodily<br>harm. | **23.** Whosoever shall unlawfully and maliciously administer to or cause to be administered to or taken by any other person any poison or other destructive or noxious thing, so as thereby to endanger the life of such person, or so as thereby to inflict upon such person any grievous bodily harm, shall be guilty of felony, and being convicted thereof . . . shall be liable . . . to be kept in penal servitude for any term not exceeding ten years . . . |
| Maliciously<br>administering<br>poison, &c.,<br>with intent to<br>injure,<br>aggrieve, or<br>annoy any<br>other person. | **24.** Whosoever shall unlawfully and maliciously administer to or cause to be administered to or taken by any other person any poison or other destructive or noxious thing, with intent to injure, aggrieve, or annoy such person, shall be guilty of a misdemeanor, and being convicted . . . thereof shall be liable to be kept in penal servitude . . . |
| Person charged<br>with felony<br>under sect. 23<br>may be found<br>guilty of<br>misdemeanor<br>under sect. 24. | **25.** If, upon the trial of any person for any felony in the last but one preceding section mentioned, the jury shall not be satisfied that such person is guilty thereof, but shall be satisfied that he is guilty of any misdemeanor in the last preceding section mentioned, then and in every such case the jury may acquit the accused of such felony, and find him guilty of such misdemeanor, and thereupon he shall be liable to be punished in the same manner as if convicted upon an indictment for such misdemeanor. |

apprentices or
servants with
food, &c., or
doing bodily
harm, whereby
life is
endangered, or
health
permanently
injured.

whosoever, being legally liable, either as a master or mistress, to provide for any apprentice or servant necessary food, clothing, or lodging, shall wilfully and without lawful excuse refuse or neglect to provide the same, or shall unlawfully and maliciously do or cause to be done any bodily harm to any such apprentice or servant, so that the life of such apprentice or servant shall be endangered, or the health of such apprentice or servant shall have been or shall be likely to be permanently injured, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude . . .

Exposing child,
whereby life is
endangered, or
health
permanently
injured.

**27.** Whosoever shall unlawfully abandon or expose any child, being under the age of two years, whereby the life of such child shall be endangered, or the health of such child shall have been or shall be likely to be permanently injured, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude . . .

Causing bodily
injury by
gunpowder.

**28.** Whosoever shall unlawfully and maliciously, by the explosion of gunpowder or other explosive substance, burn, maim, disfigure, disable, or do any grievous bodily harm to any person, shall be guilty of felony, and being convicted thereof shall be liable, at the discretion of the court, to be kept in penal servitude for life . . . or to be imprisoned . . . and, if a male under the age of sixteen years, with or without whipping.

Causing
gunpowder to
explode, or
sending to any
person an
explosive
substance, or
throwing
corrosive fluid
on a person,
with intent to
do grievous
bodily harm.

**29.** Whosoever shall unlawfully and maliciously cause any gunpowder or other explosive substance to explode, or send or deliver to or cause to be taken or received by any person any explosive substance or any other dangerous or noxious thing, or put or lay at any place, or cast or throw at or upon or otherwise apply to any person, any corrosive fluid or any destructive or explosive substance, with intent in any of the cases aforesaid to burn, maim, disfigure, or disable any person, or to do some grievous bodily harm to any person, shall, whether any bodily injury be effected or not, be guilty of felony, and being convicted thereof shall be liable, at the discretion of the court, to be kept in penal servitude for life . . . or to be imprisoned . . . and, if a male under the age of sixteen years, with or without whipping.

gunpowder near any building, ship, or vessel, any gunpowder or other explosive substance, with intent

near a building, to do any bodily injury to any person, shall, whether or not any explosion take place, and

&c., with intent whether or not any bodily injury be effected, be guilty of felony, and being convicted thereof

to do bodily shall be liable, at the discretion of the court, to be kept in penal servitude for any term not

injury to any exceeding fourteen years . . . or to be imprisoned . . . and, if a male under the age of sixteen

person. years, with or without whipping.

Setting spring       **31.** Whosoever shall set or place, or cause to be set or placed, any spring gun, man trap,

guns, &c., with or other engine calculated to destroy human life or inflict grievous bodily harm, with the

intent to inflict intent that the same or whereby the same may destroy or inflict grievous bodily harm upon

grievous bodily a trespasser or other person coming in contact therewith, shall be guilty of a misdemeanor,

harm, and being convicted thereof shall be liable . . . to be kept in penal servitude . . . ; and

or allowing the whosoever shall knowingly and wilfully permit any such spring gun, man trap, or other

same to engine which may have been set or placed in any place then being in or afterwards coming

remain. into his possession or occupation by some other person to continue so set or placed, shall

Proviso as to be deemed to have set and placed such gun, trap, or engine with such intent as aforesaid:

traps for Provided, that nothing in this section contained shall extend to make it illegal to set or place

vermin, any gin or trap such as may have been or may be usually set or placed with the intent of

and spring destroying vermin: Provided also, that nothing in this section shall be deemed to make it

guns, &c. se at unlawful to set or place, or cause to be set or placed, or to be continued set or placed, from

night for sunset to sunrise, any spring gun man trap, or other engine which shall be set or placed, or

protection of caused or continued to be set or placed, in a dwelling house, for the protection thereof.

dwelling-

houses.

Placing wood,       **32.** Whosoever shall unlawfully and maliciously put or throw upon or across any railway

&c. on railway, any wood, stone, or other matter or thing, or shall unlawfully and maliciously take up,

taking up rails, remove, or displace any rail, sleeper, or other matter or thing belonging to any railway, or

turning points, shall unlawfully and maliciously turn, move, or divert any points or other machinery

showing or belonging to any railway, or shall unlawfully and maliciously make or show, hide or remove,

hiding signals, any signal or light upon or near to any railway, or shall unlawfully and maliciously do or

&c., with intend cause to be done any other matter or thing, with intent, in any of the cases aforesaid, to

to endanger endanger the safety of any person travelling or being upon such railway, shall be guilty of

passengers. felony, and being convicted thereof shall be liable, at the discretion of the court, to be kept

in penal servitude for life . . . or to be imprisoned . . . and, if a male under the age of sixteen

years, with or without whipping.

**&c. upon a railway carriage, with intent to endanger the safety of any person therein, or in any part of the same train.**

into, or upon any engine, tender, carriage, or truck used upon any railway, any wood, stone, or other matter or thing, with intent to injure or endanger the safety of any person being in or upon such engine, tender, carriage, or truck, or in or upon any other engine, tender, carriage, or truck of any train of which such first-mentioned engine, tender, carriage, or truck shall form part, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

**Doing or omitting anything so as to endanger passengers by railway.**

**34.** Whosoever, by any unlawful act, or by any wilful omission or neglect, shall endanger or cause to be endangered the safety of any person conveyed or being in or upon a railway, or shall aid or assist therein, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

**Drivers of carriages injuring persons by furious driving.**

**35.** Whosoever, having the charge of any carriage or vehicle, shall by wanton or furious driving or racing, or other wilful misconduct, or by wilful neglect, do or cause to be done any bodily harm to any person whatsoever, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

*Assaults.*

**Obstructing or assaulting a clergyman or other minister in the discharge of his duties in place of worship or burial place, or on his way thither.**

**36.** Whosoever shall, by threats or force, obstruct or prevent or endeavour to obstruct or prevent, any clergyman or other minister in or from celebrating divine service or otherwise officiating in any church, chapel, meeting house, or other place of divine worship, or in or from the performance of his duty in the lawful burial of the dead in any churchyard or other burial place, or shall strike or offer any violence to, or shall, upon any civil process, or under the pretence of executing any civil process, arrest any clergyman or other minister who is engaged in, or to the knowledge of the offender is about to engage in, any of the rites or duties in this section aforesaid, or who to the knowledge of the offender shall be going to perform the same or returning from the performance thereof, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

magistrate, &c. whatsoever lawfully authorized, in or on account of the exercise of his duty in or concerning the preservation of any vessel in distress, or of any vessel, goods, or effects wrecked, stranded, or cast on shore, or lying under water, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude for any term not exceeding seven years . . .

*on account of his preserving wreck.*

**38.** Whosoever shall assault any person with intent to commit felony, or shall assault, resist, or wilfully obstruct any peace officer in the due execution of his duty, or any person acting in aid of such officer, or shall assault any person with intent to resist or prevent the lawful apprehension or detainer of himself or of any other person for any offence, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

*Assault with intent to commit felony or on peace officers, &c.*

**39.** Whosoever shall beat, or use any violence or threat of violence to any person, with intent to deter or hinder him from buying, selling, or otherwise disposing of, or to compel him to buy, sell, or otherwise dispose of, any wheat or other grain, flour, meal, malt, or potatoes, in any market or other place, or shall beat or use any such violence or threat to any person having the care or charge of any wheat or other grain, flour, meal, malt, or potatoes, whilst on the way to or from any city, market town, or other place, with intent to stop the conveyance of the same, shall on conviction thereof before two justices of the peace be liable to be imprisoned and kept to hard labour in the common gaol or house of correction for any term not exceeding three months: Provided, that no person who shall be punished for any such offence by virtue of this section shall be punished for the same offence by virtue of any other law whatsoever.

*Assaults with intent to obstruct the sale of grain, or potatoes, in its free passage.*

*Summary proceedings.*

**40.** Whosoever shall unlawfully and with force hinder or prevent any seaman, keelman, or caster from working at or exercising his lawful trade, business, or occupation, or shall beat or use any violence to any such person with intent to hinder or prevent him from working at or exercising the same, shall on conviction thereof before two justices of the peace be liable to be imprisoned and kept to hard labour in the common gaol or house of correction for any term not exceeding three months: Provided, that no person who shall be punished for any such offence by reason of this section shall be punished for the same offence by virtue of any other law whatsoever.

*Assaults on seamen, &c.*

*Summary proceedings.*

[*S.* 41 *rep.* 34 & 35 *Vict. c.* 32. *s.* 7.]

committing any peace, upon complaint by or on behalf of the party aggrieved, may hear and determine such offence, and the offender shall, upon conviction thereof before them, at the discretion of the justices, either be committed to the common gaol or house of correction, there to be imprisoned, with or without hard labour, for any term not exceeding two months, or else shall forfeit and pay such fine as shall appear to them to be meet, not exceeding, together with costs (if ordered), the sum of five pounds; and if such fine as shall be so awarded, together with the costs (if ordered), shall not be paid, either immediately after the conviction or within such period as the said justices shall at the time of the conviction appoint, they may commit the offender to the common gaol or house of correction, there to be imprisoned, with or without hard labour, for any term not exceeding two months, unless such fine and costs be sooner paid.

*common assault or battery may be imprisoned or compelled by two magistrates to pay fine and costs not exceeding 5l.*

**43.** When any person shall be charged before two justices of the peace with an assault or battery upon any male child whose age shall not in the opinion of such justices exceed fourteen years, or upon any female, either upon the complaint of the party aggrieved or otherwise, the said justices, if the assault or battery is of such an aggravated nature that it cannot in their opinion be sufficiently punished under the provisions herein-before contained as to common assaults and batteries, may proceed to hear and determine the same in a summary way, and, if the same be proved, may convict the person accused; and every such offender shall be liable to be imprisoned in the common gaol or house of correction, with or without hard labour, for any period not exceeding six months, or to pay a fine not exceeding (together with costs) the sum of twenty pounds, and in default of payment to be imprisoned in the common gaol or house of correction for any period not exceeding six months, unless such fine and costs be sooner paid, and, if the justices shall so think fit, in any of the said cases, shall be bound to keep the peace and be of good behaviour for any period not exceeding six months from the expiration of such sentence.

*Persons convicted of aggravated assaults on females and boys under fourteen years of age may be imprisoned or fined, and bound over to keep the peace.*

**44.** If the justices, upon the hearing of any such case of assault or battery upon the merits, where the complaint was preferred by or on behalf of the party aggrieved, under either of the last two preceding sections, shall deem the offence not to be proved, or shall find the assault or battery to have been justified, or so trifling as not to merit any punishment, and shall accordingly dismiss the complaint, they shall forthwith make out a certificate under their hands stating the fact of such dismissal, and shall deliver such certificate to the party against whom the complaint was preferred.

*If the magistrates shall dismiss any complaint of assault or battery, they shall make out a certificate to that effect.*

**be a bar to any other proceedings.** shall have obtained such certificate, or, having been convicted, shall have paid the whole amount adjudged to be paid, or shall have suffered the imprisonment or imprisonment with hard labour awarded, in every such case he shall be released from all further or other proceedings, civil or criminal, for the same cause.

**These provisions not to apply to certain cases.** **46.** Provided, that in case the justices shall find the assault or battery complained of to have been accompanied by any attempt to commit felony, or shall be of opinion that the same is, from any other circumstance, a fit subject for a prosecution by indictment, they shall abstain from any adjudication there-upon, and shall deal with the case in all respects in the same manner as if they had no authority finally to hear and determine the same: Provided also, that nothing herein contained shall authorize any justices to hear and determine any case of assault or battery in which any question shall arise as to the title to any lands, tenements, or hereditaments, or any interest therein or accruing therefrom, or as to any bankruptcy or insolvency, or any execution under the process of any court of justice.

**Assault occasioning bodily harm.** **Common assault.** **47.** Whosoever shall be convicted upon an indictment of any assault occasioning actual bodily harm shall be liable . . . to be kept in penal servitude . . . ; and whosoever shall be convicted upon an indictment for a common assault shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding one year, with or without hard labour.

### Rape, Abduction, and Defilement of Women.

**Rape.** **48.** Whosoever shall be convicted of the crime of rape shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

[*S.* 49 *rep.* 48 & 49 *Vict. c.* 69. *s.* 19. *Ss.* 50, 51 *rep.* 38 & 39 *Vict. c.* 94. *s.* 2.]

**Indecent assault upon a female.** **52.** Whosoever shall be convicted of any indecent assault upon any female . . . shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

her will, from motives of lucre.

shall be a presumptive heiress or coheiress, or presumptive next of kin, or one of the presumptive next of kin, to any one having such interest, whosoever shall, from motives of lucre, take away or detain such woman against her will, with intent to marry or carnally know her, or to cause her to be married or carnally known by any other person, and whosoever shall fraudulently allure, take away, or detain such woman, being under the age of twenty-one years, out of the possession and against the will of her father or mother, or of any other person having the lawful care or charge of her, with intent to marry or carnally know her, or to cause her to be married or carnally known by any other person, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for any term not exceeding fourteen years . . . ; and whosoever shall be convicted of any offence against this section shall be incapable of taking any estate or interest, legal or equitable, in any real or personal property of such woman, or in which she shall have any such interest, or which shall come to her as such heiress, coheiress, or next of kin as aforesaid; and if any such marriage as aforesaid shall have taken place, such property shall, upon such conviction, be settled in such manner as the Court of Chancery in England or Ireland shall upon any information at the suit of the Attorney General appoint.

Fraudulent abduction of a girl under age against the will of her father, &c.

Offender incapable of taking any of the property of the woman abducted.

In case of marriage, property to be settled by Court of Chancery.

Forcible abduction of any woman with intent to marry or carnally know her, &c.

**54.** Whosoever shall, by force, take away or detain against her will any woman, of any age, with intent to marry or carnally know her, or to cause her to be married or carnally known by any other person, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for any term not exceeding fourteen years . . .

Abduction of a girl under sixteen years of age.

**55.** Whosoever shall unlawfully take or cause to be taken any unmarried girl, being under the age of sixteen years, out of the possession and against the will of her father or mother, or of any other person having the lawful care or charge of her, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour.

*Child-stealing.*

or receiving
stolen child.

entice away or detain, any child under the age of fourteen years, with intent to deprive any parent, guardian, or other person having the lawful care or charge of such child of the possession of such child, or with intent to steal any article upon or about the person of such child, to whomsoever such article may belong, and whosoever shall, with any such intent, receive or harbour any such child, knowing the same to have been, by force or fraud, led, taken, decoyed, enticed away, or detained, as in this section before mentioned, shall be guilty of felony, and being convicted thereof shall be liable, at the discretion of the court, to be kept in penal servitude for any term not exceeding seven years . . . ,—or to be imprisoned . . . ; and, if a male under the age of sixteen years, with or without whipping: Provided, that no person who shall have claimed any right to the possession of such child, or shall be the mother or shall have claimed to be the father of an illegitimate child, shall be liable to be prosecuted by virtue hereof on account of the getting possession of such child, or taking such child out of the possession of any person having the lawful charge thereof.

## Bigamy.

Bigamy.

Offence may
be dealt with
where offender
shall be
apprehended.

Nothing herein
contained to
extend to
second
marriages in
the cases
herein
mentioned.

**57.** Whosoever, being married, shall marry any other person during the life of the former husband or wife, whether the second marriage shall have taken place in England or Ireland or elsewhere, shall be guilty of felony, and being convicted thereof shall be liable to be kept in penal servitude for any term not exceeding seven years; and any such offence may be dealt with, inquired of, tried, determined, and punished in any county or place in England or Ireland where the offender shall be apprehended or be in custody, in the same manner in all respects as if the offence had been actually committed in that county or place: Provided, that nothing in this section contained shall extend to any second marriage contracted elsewhere than in England and Ireland by any other than a subject of Her Majesty, or to any person marrying a second time whose husband or wife shall have been continually absent from such person for the space of seven years then last past, and shall not have been known by such person to be living within that time, or shall extend to any person who, at the time of such second marriage, shall have been divorced from the bond of the first marriage, or to any person whose former marriage shall have been declared void by the sentence of any court of competent jurisdiction.

## Attempts to procure Abortion.

Administering
drugs or using
instruments to
procure
abortion.

**58.** Every woman, being with child, who, with intent to procure her own miscarriage, shall unlawfully administer to herself any poison or other noxious thing, or shall unlawfully use any instrument or other means whatsoever with the like intent, and whosoever, with intent to procure the miscarriage of any woman, whether she be or be not with child, shall unlawfully administer to her or cause to be taken by her any poison or other noxious thing, or shall unlawfully use any instrument or other means whatsoever with the like intent, shall be guilty of felony, and being convicted thereof shall be liable . . . to be kept in penal servitude for life . . .

drugs, &c. to cause abortion. soever shall unlawfully supply or procure any poison or other noxious thing, or any instrument or thing whatsoever, knowing that the same is intended to be unlawfully used or employed with intent to procure the miscarriage of any woman, whether she be or be not with child, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude . . .

## Concealing the Birth of a Child.

Concealing the birth of a child.

Conviction for concealment of birth on trial for murder of child.

**60.** If any woman shall be delivered of a child, every person who shall, by any secret disposition of the dead body of the said child, whether such child died before, at, or after its birth, endeavour to conceal the birth thereof, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour: Provided, that if any person tried for the murder of any child shall be acquitted thereof, it shall be lawful for the jury by whose verdict such person shall be acquitted to find, in case it shall so appear in evidence, that the child had recently been born, and that such person did, by some secret disposition of the dead body of such child, endeavour to conceal the birth thereof, and thereupon the court may pass such sentence as if such person had been convicted upon an indictment for the concealment of the birth.

## Unnatural Offences.

Sodomy and bestiality.

**61.** Whosoever shall be convicted of the abominable crime of buggery, committed either with mankind or with any animal, shall be liable . . . to be kept in penal servitude for life . . .

Attempt to commit an infamous crime.

**62.** Whosoever shall attempt to commit the said abominable crime, or shall be guilty of any assault with intent to commit the same, or of any indecent assault upon any male person, shall be guilty of a misdemeanor, and being convicted thereof shall be liable . . . to be kept in penal servitude for any term not exceeding ten years . . .

Carnal knowledge defined.

**63.** Whenever, upon the trial for any offence punishable under this Act, it may be necessary to prove carnal knowledge, it shall not be necessary to prove the actual emission of seed in order to constitute a carnal knowledge, but the carnal knowledge shall be deemed complete upon proof of penetration only.

## Making Gunpowder to commit Offences, and searching for the same.

having
gunpowder,
&c., with intent
to commit or
enable any
person to
commit any
felony
mentioned in
this Act.
gunpowder, explosive substance, or any dangerous or noxious thing, or any machine, engine, instrument, or thing, with intent by means thereof to commit, or for the purpose of enabling any other person to commit, any of the felonies in this Act mentioned shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be imprisoned for any term not exceeding two years, with or without hard labour . . . and, if a male under the age of sixteen years, with or without whipping.

Justices may
issue warrants
for searching
houses, &c. in
which
explosive
substances are
suspected to
be made or
kept for use in
committing any
felonies
mentioned in
this Act.

23 & 24 Vict. c.
139.
65. Any justice of the peace of any county or place in which any such gunpowder, or other explosive, dangerous, or noxious substance or thing, or any such machine, engine, instrument or thing, is suspected to be made, kept, or carried for the purpose of being used in committing any of the felonies in this Act mentioned, upon reasonable cause assigned upon oath by any person, may issue a warrant under his hand and seal for searching, in the daytime, any house, mill, magazine, storehouse, warehouse, shop, cellar, yard, wharf, or other place, or any carriage, waggon, cart, ship, boat, or vessel, in which the same is suspected to be made, kept, or carried for such purpose as herein-before mentioned; and every person acting in the execution of any such warrant shall have, for seizing, removing to proper places, and detaining all such gunpowder, explosive, dangerous, or noxious substances, machines, engines, instruments, or things, found upon such search, which he shall have good cause to suspect to be intended to be used in committing any such offence, and the barrels, packages, cases and other receptacles in which the same shall be, the same powers and protections which are given to persons searching for unlawful quantities of gunpowder under the warrant of a justice by the [1] Act passed in the session holden in the twenty-third and twenty-fourth years of the reign of Her present Majesty, chapter one hundred and thirty-nine, intituled, "An Act to amend the law "concerning the making, keeping, and carriage of gunpowder "and compositions of an explosive nature, and concerning the "manufacture, sale, and use of fireworks."

## Other Matters.

A person
loitering at
night, and
suspected of
any felony
against this Act,
may be
apprehended.
66. Any constable or peace officer may take into custody, without a warrant, any person whom he shall find lying or loitering in any highway, yard, or other place during the night, and whom he shall have good cause to suspect of having committed or being about to commit any felony in this Act mentioned, and shall take such person as soon as reasonably may be before a justice of the peace, to be dealt with according to law.

| | |
|---|---|
| principals in the second degree, and accessories.<br><br>Abettors in misdemeanors. | degree, and every accessory before the fact, shall be punishable in the same manner as the principal in the first degree is by this Act punishable; and every accessory after the fact to any felony punishable under this Act (except murder) shall be liable to be imprisoned for any term not exceeding two years, with or without hard labour; and every accessory after the fact to murder shall be liable, at the discretion of the court, to be kept in penal servitude for life, or for any term not less than three years, or to be imprisoned for any term not exceeding two years, with or without hard labour; and whosoever shall counsel, aid, or abet the commission of any indictable misdemeanor punishable under this Act shall be liable to be proceeded against, indicted, and punished as a principal offender. |
| Offences committed within the jurisdiction of the Admiralty. | **68.** All indictable offences mentioned in this Act which shall be committed within the jurisdiction of the Admiralty of England or Ireland shall be deemed to be offences of the same nature, and liable to the same punishments, as if they had been committed upon the land in England or Ireland, and may be dealt with, inquired of, tried, and determined in any county or place in England or Ireland in which the offender shall be apprehended or be in custody, in the same manner in all respects as if they had been actually committed in that county or place; and in any indictment for any such offence, or for being an accessory to such an offence, the venue in the margin shall be the same as if the offence had been committed in such county or place, and the offence shall be averred to have been committed "on the high seas": Provided, that nothing herein contained shall alter or affect any of the laws relating to the government of Her Majesty's land or naval forces. |

[*S.* 69 *rep.* 55 & 56 *Vict. c.* 19. (*S.L.R.*)]

| | |
|---|---|
| Whipping. | **70.** . . . whenever whipping may be awarded for any offence under this Act, the court may sentence the offender to be once privately whipped; and the number of strokes, and the instrument with which they shall be inflicted, shall be specified by the court in the sentence. |
| Fine, and sureties for keeping the peace; in what cases. | **71.** Whenever any person shall be convicted of any indictable misdemeanor punishable under this Act, the court may, if it shall think fit, in addition to or in lieu of any punishment by this Act authorized, fine the offender, and require him to enter into his own recognizances, and to find sureties, both or either, for keeping the peace and being of good behaviour; and in case of any felony punishable under this Act otherwise than with death the court may, if it shall think fit, require the offender to enter into his own recognizances, and to find sureties, both or either, for keeping the peace, in addition to any punishment by this Act authorized: Provided, that no person shall be imprisoned for not finding sureties under this clause for any period exceeding one year. |
| No certiorari, &c. | **72.** No summary conviction under this Act shall be quashed for want of form, or be removed by certiorari into any of Her Majesty's Superior Courts of Record; and no warrant of commitment shall be held void by reason of any defect therein, provided it be therein alleged that the party has been convicted, and there be a good and valid conviction to sustain the same. |

be required to prosecute in certain cases of offences against this Act. which the party committing it is liable to be indicted, and the circumstances of which offence amount, in point of law, to a felony, or an attempt to commit a felony, or an assault with intent to commit a felony, and two justices of the peace before whom such complaint is heard shall certify under their hands that it is necessary for the purposes of public justice that the prosecution should be conducted by the guardians of the union or place, or, where

Costs of prosecution.

Clerk of guardians may be bound over to prosecute. there are no guardians, by the overseers of the poor of the place, in which the offence shall be charged to have been committed, such guardians or overseers, as the case may be, upon personal service of such certificate or a duplicate thereof upon the clerk of such guardians, or upon any one of such overseers, shall conduct the prosecution, and shall pay the costs reasonably and properly incurred by them therein (so far as the same shall not be allowed to them under any order of any court) out of the common fund of the union, or out of the funds in the hands of the guardians or overseers, as the case may be; and, where there is a board of guardians, the clerk or some other officer of the union or place, and, where there is no board of guardians, one of the overseers of the poor, may, if such justices think it necessary for the purposes of public justice, be bound over to prosecute.

On a conviction for assault the court may order payment of the prosecutor's costs by the defendant. **74.** Where any person shall be convicted on any indictment of any assault, whether with or without battery and wounding, or either of them, such person may, if the court think fit, in addition to any sentence which the court may deem proper for the offence, be adjudged to pay to the prosecutor his actual and necessary costs and expenses of the prosecution, and such moderate allowance for the loss of time as the court shall by affidavit or other inquiry and examination ascertain to be reasonable; and unless the sum so awarded shall be sooner paid, the offender shall be imprisoned for any term the court shall award, not exceeding three months, in addition to the term of imprisonment (if any) to which the offender may be sentenced for the offence.

Such costs may be levied by distress. **75.** The court may, by warrant under hand and seal, order such sum as shall be so awarded to be levied by distress and sale of the goods and chattels of the offender, and paid to the prosecutor, and that the surplus, if any, arising from such sale shall be paid to the owner; and in case such sum shall be so levied, the imprisonment awarded until payment of such sum shall thereupon cease.

proceeding. England in the manner directed by the Summary Jurisdiction Act, 1848, and may be prosecuted in Ireland before two or more justices of the peace, or one metropolitan or stipendiary magistrate, in the manner directed by the Petty Sessions (Ireland) Act, 1851, or in such other manner as may be directed by any Act that may be passed for like purposes; and all provisions contained in the said Acts shall be applicable to such prosecutions, in the same manner as if they were incorporated in this Act: Provided, that nothing in this Act contained shall in any manner alter or affect any enactment now in force relating to procedure in the case of any offence punishable on summary conviction within the City of London or the Metropolitan Police District, or the recovery or application of any penalty or forfeiture for any such offence.

*11 & 12 Vict. c. 43.*

*14 & 15 Vict. c. 93.*

*Saving for London and the Metropolitan Police District.*

*Costs of prosecution.*

**77.** The court before which any misdemeanor indictable under the provisions of this Act shall be prosecuted or tried may allow the costs of the prosecution in the same manner as in cases of felony; and every order for the payment of such costs shall be made out, and the sum of money mentioned therein paid and repaid, upon the same terms and in the same manner in all respects as in cases of felony.

*Extent of Act.*

**78.** Nothing in this Act contained shall extend to Scotland, except as herein-before otherwise expressly provided.

[*S.* 79 *rep.* 55 & 56 *Vict. c.* 19. (*S.L.R.*)]

[[1] Short title, "The Offences against the Person Act, 1861." *See* 55 & 56 Vict. c. 10.]

[[1] 9 Geo. 4. c. 31, which is rep. 24 & 25 Vict. c. 95. s. 1. came into operation 1 July 1828.]

[[1] 23 & 24 Vict. c. 139. is rep. 38 & 39 Vict. c. 17. s. 122; but *see* s. 86 of that Act.]

Library
Office of the DPP
Certified True Copy

2 5 MAY 2021

Signed: *[signature]*
P.P. Law Librarian

**Part 3: Material required pursuant to Article VIII, Paragraph 4 of the Treaty on Extradition between Ireland and the United States of America.**

(a) By the original or an authenticated copy of the warrant of arrest, or equivalent order, issued by a competent authority of the Requesting State;

(b) By the original or an authenticated copy of the complaint, information or indictment; and

(c) In the case of a request from Ireland by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offense has been committed and that the person sought committed it.

13

(a) The original or authenticated copy of the warrant of arrest, issued by a
    competent authority of the Requesting State

A warrant to arrest Mr Yungman was issued by Dublin District Court on 18th of
February 2020.  Please see attached authenticated copy of the warrant.

AN CHÚIRT DÚICHE                    THE DISTRICT COURT

No.

Criminal Law (Rape) (Amendment) Act 1990
Section Section 21

WARRANT TO ARREST

District Court Area of Dublin Metropolitan District

Warrant Pulse ID. 1599834
District No.

Prosecutor: the Director of Public Prosecutions
Accused: Kevin Yungman of 750 Heritage Drive, Weston, Florida, United States of America.
33326..
WHEREAS a complaint has been made on oath and in writing that you the said accused did
Between the 04/06/2018 and 05/06/2018, both dates inclusive at  104 Viking Harbour
Apartments Dublin 8  in said District Court Area of Dublin Metropolitan District , did
rape one   Viviam Marques de Sousa   a female.
Contrary to Section 48 Offences Against the Person Act, 1861 and Section 2 of the
Criminal Law (Rape) Act, 1981 as amended by section 21 of the Criminal Law (Rape)
(Amendment) Act, 1990..
THIS IS TO COMMAND YOU to whom this warrant is addressed to arrest the said Kevin Yungman
of 750 Heritage Drive, Weston, Florida, United States of America. 33326. and to bring
him  without any delay before me or another Judge to be dealt with according to law.

Dated this .....18th..... day of ....February.. 20.. 20 ..,

Signed.............................................
**Judge of District Court**

To the Superintendent of the Garda Síochána
At

I certify that this is a true copy of the original
Signed:
Date:                            Garda Extradition Section

(b) The original or an authenticated copy of the complaint, information or indictment

Please see attached authenticated copy of the information sworn on 18th of February 2020.



## An tSeirbhís Chúirteanna
## Courts Service

District Court Area of the Dublin Metropolitan District

**Re: Information Regarding Mr. Kevin Yungman, DOB 08/09/1992 of 750 Heritage**
**Drive, Weston, Florida, United States of America 33326.**

Pursuant to Part II of the Extradition Act, 1965, I _Martina Jones_ District Court Clerk, Dublin Metropolitan District, do hereby authenticate the signature of Judge Michael Walsh attached to the Information dated the 18th of February, 2020; sworn by Sergeant Colum Reilly of An Garda Siochana, Kevin Street Garda Station and on the Arrest Warrant subsequently obtained.

The original Information remains in the custody and control of the District Court Office at the Criminal Courts of Justice, Dublin.

_Martina Jones_ Ct3 CCJ

Dated; 22/9/20

I certify that this is a true copy of the original
Signed
Date 2/6/20       Garda Extradition Section

No.

Criminal Law (Rape) (Amendment) Act 1990
Section Section 21

INFORMATION FOR ARREST WARRANT

Warrant Pulse ID. 1599834

District Court Area of Dublin Metropolitan District

District No.

Prosecutor the Director of Public Prosecutions
Accused Kevin Yungman of 750 Heritage Drive, Weston, Floride, united States of America,
33326.
THE INFORMATION of Sergeant Colum J Reilly of Kevin Street Garda Station, who says on
oath :-
I am a member of the Garda Síochána of Kevin Street Garda Station.
Viviam Marques de Sousa is a Brazilian National who was working in Ireland as an Au Pair
in 2018. In April of 2018 when on holidays in Paris she first met with Mr. Kevin Yungman
and they began a relationship. Both persons spent two days together in Paris and engaged
in a physical relationship, which was consensual. Mz. Marques de Sousa then returned to
Ireland on the 9th of April, 2018 and maintained contact with Mr. Yungman via telephone
and various social media formats until both persons agreed that Mr. Yungman would travel
to Dublin for a holiday to see Mz. Marques de Sousa. He arrived into Dublin Airport on
the 3rd of June, 2018 on a Ryanair flight from Amsterdam. Mz. Marques de Sousa had booked
an AirB&B at 104 Viking Harbour Apartments, Dublin 8 for three nights; this is the
alleged scene of where the offence was perpetrated. In her statement of complaint to
Gardai, made on the 6th of June, 2018; Mz. Marques de Sousa makes it clear that during
the later hours of the 4th of June, 2018 and the early hours of the 5th of June, 2018
both parties engaged in sexual activity in the apartment. At some point both parties
moved to the bedroom of the apartment and it is alleged that while on the bed, Mr.
Yungman used both his hands, placed around the Injured Party's neck, to physically
restrain her, to the point where she lost consciousness. On regaining consciousness, Mz.
Marques de Sousa alleges that Mr. Yungman was engaged in sexual intercourse with her and
that she was not physically able to stop him from doing so, nor had she given him consent
to engage in this act. A complaint was made to Gardai in relation to the actions of Mr.
Yungman on the 6th of June, 2018. A full investigation was conducted and on the 13th of
February, 2020; the Director of Public Prosecutions directed that Mr. Yungman be
prosecuted on indictment at the Central Criminal Court for an offence contrary to Section
48 of the Offences Against the Person Act, 1861 and Section 2 of the Criminal Law (Rape)
Act, 1981 as amended by Section 21 of the Criminal Law (Rape)(Amendment) Act, 1990. .
I therefore apply for the issue of a warrant of arrest of the accused Kevin Yungman of
750 Heritage Drive, Weston, Florida, United States of America, 33326.

I certify that this is a true copy of the original.
Signed:
Date:                    Garda Extradition Section

Sworn before me this 18 day of .....February........ 20..20

At  Dublin Metropolitan District Courts  Court

Signed.....................................................

Judge of District Court

I certify that this is a true copy of the original

Signed:

Date: ................. , Garda Extradition Section

(c) In the case of a request from Ireland by a statement of facts, by way of affidavit or statutory declaration, setting forth reasonable grounds for believing that an offense has been committed and that the person sought committed it.

Please see attached sworn affidavit of Michael Durkan.

16

## AFFIDAVIT IN ACCORDANCE WITH ARTICLE VIII (4) (c) OF THE TREATY ON EXTRADITION BETWEEN IRELAND AND THE UNITED STATES OF AMERICA

I Michael Durkan of Infirmary Road, Dublin 7, Ireland aged eighteen years and upwards make oath and say as follows:

1. I am a Senior Prosecution Solicitor in the Office of the Director of Public Prosecutions in Ireland. The Director of Public Prosecutions enforces the criminal law in the Irish Courts on behalf of the People of Ireland.

2. As a professional officer appointed pursuant to the Prosecution of Offences Act 1974, I am authorised by the Director of Public Prosecutions to act on her behalf in relation to criminal cases. This Affidavit is made based on my capacity as outlined and based on my review of the investigative files.

3. I am the affiant for the "Affidavit in Accordance with Article VIII (4) (c) of The Treaty on Extradition between Ireland and the United States of America" submitted as part of the Extradition Package from (the Republic of) Ireland.

4. I say and believe that the Office of the Director of Public Prosecutions received an investigation file from the Garda Siochana in relation to an allegations of rape by Kevin Yungman (date of birth 8th of September 1992).

5. The file forwarded contained a number of statements with various documents and information pertinent to the investigation including the memorandum of interviews taken from Kevin Yungman following his arrest for the investigation of the offences alleged.

6. Following a full independent consideration of the information on the file, on the 13th day of February directions issued from the Office of the Director of Public Prosecutions to charge Kevin Yungman with the following offence: *'Between the 04th June 2018 and the 05th June 2018, both dates inclusive at Apartment 104, Viking Harbour Apartments, Dublin 8 in said Dublin Metropolitan District, did rape one Vivian Marques de Sousa, a female person contrary to Section 48 Offences Against the Person Act, 1861 and Section 2 of the Criminal Law (Rape) Act, 1981 as amended by section 21 of the Criminal Law (Rape) Act, 1990'.*

7. I say and believe that based on the facts on file averred to in this Affidavit that there are reasonable grounds for believing that the charges as directed were committed by Kevin Yungman and that there is sufficient evidence for Kevin Yungman to stand trial on the charges as directed.

8. The Garda Siochana have confirmed that the required prosecution witnesses are still available and are prepared to give evidence in any such prosecution.

9. I say and believe that it will be necessary for the purposes of prosecuting Kevin Yungman with the charges as directed to seek his extradition. It is believed that Kevin Yungman is presently residing in the United States of America.

10. All representations made in the Statement of Pertinent Facts previously submitted as Part 2(b) of the Kevin Yungman (name of person sought) Extradition Package are based on information that I know directly, through others, and from the files and information that I have reviewed.

11. The facts / representations as set out in the Statement of Pertinent Facts submitted as Part 2(b) of the Kevin Yungman Extradition package, were obtained from the comprehensive file presented by the investigative team of the Garda Siochana to the Office of the Director of Public Prosecutions. This file contained a large number of statements and documents taken pursuant to the investigation of the alleged offence, the subject matter of the Extradition Request.

12. All representations in the Extradition package namely as contained under Part 1 (a). (b) (c) and Part 2 (a). (b). (c) in addition to Part 3 (a). (b) (c). are based on information that I know directly, through others, and from the files and information that I have reviewed. All attachments to the Extradition package were either produced or received directly by me in the performance of my duties.

13. All representations made in this Affidavit are based on information that I know directly, through others and from the files / information that I have reviewed.

14. On the 18th day of February 2020 Sergeant Colum J Reilly, acting in accordance with directions issued by the Office of the Director of Public Prosecutions obtained a domestic warrant for the arrest of Kevin Yungman from the presiding Judge at Dublin Metropolitan District Court in respect of the offence / charge as stipulated in the Extradition Request to the U.S authorities (the subject matter of the Extradition Request submitted by the Irish authorities).

**Sworn** the 24th day of May 2021
by the said Michael Durkan at the *CIS, Parkgate St.* in the County of the City of Dublin
before me a Commissioner for Oaths/Practising Solicitor
and I know the Deponent.

Deponent

Commissioner for Oaths / Practising Solicitor

**AFFIDAVIT IN ACCORDANCE WITH ARTICLE VIII (4) (C) OF THE TREATY ON EXTRADITION BETWEEN IRELAND AND THE UNITED STATES OF AMERICA**

I Michael Durkan of Infirmary Road, Dublin 7, Ireland, aged eighteen years and upwards make oath and say as follows:

1. I am a Senior Prosecution Solicitor in the Office of the Director of Public Prosecutions in Ireland. The Director of Public Prosecutions enforces the criminal law in the Irish Courts on behalf of the People of Ireland. As a professional officer appointed pursuant to the Prosecution of Offences Act 1974, I am authorised by the Director of Public Prosecutions to act on her behalf in relation to criminal cases.

2. I make this Affidavit further to the Original Affidavit and in order to supplement the Government of Ireland's request for the extradition of Kevin Yungman.

3. I say and believe that based on my review of the investigatory file which includes copies of passport photographs, identifying Kevin Yungman that were obtained by the investigating officer namely Sergeant Colum Reilly, that the photographs are a true depiction of Kevin Yungman.

4. I say and believe that the person depicted in the photographs as Kevin Yungman and included in the extradition package is the same person described as Kevin Yungman in the Statement of Facts included in the extradition package.

Sworn the 24th day of May 2021

by the said Michael Durkan

at the (3, Parkgate St in the County of the City of Dublin before me a Commissioner for Oaths/Practising Solicitor
and I know the Deponent.

Deponent    Michael Durkan

Commissioner for Oaths / Practising Solicitor

Edward Trastey

Treaty on Extradition between Ireland and the United States of America
done at Washington on the 13th of July 1983.


Request by Ireland for the Extradition from the United States of America.

Oifig an     Stiúrthóra Ionchúiseamh Poiblí
Office of the     Director of Public Prosecutions

DPP Case No: 2019/10790                               6 December 2023
Your Ref:

Central Authority for Extradition
Mutual Assistance and Extradition Division
Department of Justice and Equality
Room F025, Third Floor, Pinebrook House
71 – 74 Harcourt Street, Dublin 2

RE:     **Kevin Yungman**
        **Sexual Offences; 104 Viking Harbour Apt D8**

Dear Mr Farren,

Further to the request for the extradition of Kevin Yungman we enclose herewith the
complainant's statement.

Yours faithfully,

Deirdre Thompson
Prosecutor
International Unit
O.D.P.P.

Statement of Vivian Evol Marques De Souza of ███████████ ██████████████████████████████ ██████. Tel No. ██████████████.
Occupation: Au Pair. Date of Birth: 15.01.1999. Taken on 6th of June 2018 at Kevin Street Garda Station by Colum Reilly, Sergeant, ██████ of Kevin Street Garda Station.

I hereby declare that this statement is true to the best of my knowledge and belief and that I make it knowing that if it is tendered in evidence I will be liable to prosecution if I state in it anything which I know to be false or do not believe to be true.

My name is Vivian Evol Marques de Souza and I am an Au Pair working for a family at █ ████████████████████████████████ I have been working since July of last year for that family. Before that I was a Child Minder in Stillorgan. I came to Ireland in March of 2017 and after about two weeks I started to work in Stillorgan. When that job finished, I began working for the family ███████████████████████████████ ████████████████████████ I go to this class everyday from 9am to 12 p.m. and I cycle in everyday to class. In the afternoons then I work, I have work five days and then two days off. We can change the schedule. On the second of April this year I went on holidays to France. This was for one week, until the 9th of April. I flew from Dublin to Nice, I spent three days there, until the 5th of April. I was on my own for this holiday as my family I work for were also on holiday in Spain. When I left Nice, I flew to Bordeaux to meet a friend. I stayed in his house in Bordeaux from the fifth until the seventh of April. I met this friend here in Ireland, he was also an English student, his name is Yellick. When I left Bordeaux, I travelled by train then to Paris, arriving at around 1 p.m. on the seventh of April. I stayed in a hotel called St. Christopher's Inn until I left to fly back to Dublin. I was travelling on my own still and was visiting Paris. It was only a few hours after arriving in Paris that I met Kevin Yungman. I had gone from the train station direct to the hotel to check in and leave my bags. I think it was around 2 p.m. that I checked in. I then

changed my clothes and went to the meeting point for the free walking tour, I think it was a square called St. Nicholas. I went on the tour then, it started about a quarter past three. From this place, we went to Notre Dame and some tourist spots in Paris. When we walked for one hour and a half, I met Kevin Yungman. He wasn't part of the walking tour at the beginning, but when he heard us speaking English, he came with us. The last stop on the tour was the Louvre, he got on the tour like one stop before. It was a really hot day in Paris and I was enjoying the sun. I was enjoying the tour on my own and what the tour was about. We went to some place where there was some shade and that's when Kevin came over and asked me about what I was doing, if I was trying to get a tan? That was the first contact with him. He asked me where I was from? I told him that I was from Brazil. He told me that he had been in Brazil a few weeks before he got to France. There was twenty or twenty one people on the tour. I only spoke to the tour guide on the tour, and Kevin. When the tour finished, I was waiting for the people to go. I wanted to go speak with the tour guide to get some recommendations as to where to go. Then I saw that Kevin was still waiting as well. When I finished talking to the Tour Guide, he came and asked me what I planned to do? I told him that I wasn't sure yet, but that I wanted to get something to eat, as I hadn't anything yet. He asked me if he could join me? Then I said that was no problem and we went to McDonald's on a street beside the Louvre. After we had lunch, we talked and got to know each other; I told him about Brazil and my life here studying English. We were all this time talking about myself, I didn't ask too many questions about him, but I am always like this; talking about myself when I meet someone. We tried to figure out the next place to go; it was also his first day in Paris and he hadn't seen anything else. I had a list of the places that I would like to visit; one of these was a garden, I'm not sure of the name of it. We went there, and on the way we stopped for some pictures. We spent some time in the garden and after this, I thought it would be nice to do a picnic at the Eiffel Tower; to stop at a supermarket to

get some food and a bottle of wine.   When I said that, he agreed and we started to look for a place to buy the food and the wine.  He said that we would stop at his Air B and B to get a towel to sit on.  We went there and got the towel, he went to the toilet and we took the subway to the Eiffel Tower.   It was around half ten, the first lights show was on the tower. After that we went to the park and we ate some food and started to drink some wine.   After this, we kissed for the first time.  We then went to his place in a taxi.  I agreed and wanted to go.  I that night we had sexual relations. This first night, everything was going well and we were having sex.  He asked me to start breathing fast and when I did, he told me to take a deep breath and hold it in.  And that's when he put one hand on my neck and he squeezed. At this time, I was on him, I passed out and I remember waking up.  I was on him.  We were on our own in the room.  When I woke up, my mind was a mess.  He was awake and I lied down beside him.  I didn't realise that I had passed out.  When I came around he asked me what I had seen and what I had felt.  After this I was very scared.  He came and he hugged me.  He said that it was all good, just that it was scary the first time.  After this my body was very sensitive, he was passing his hand all over my body and could feel really sensitive.  This was in the middle of the night, around 4am maybe, because it wasn't light yet.  I didn't know what to do, I didn't want to ask what had happened.  Then I decided that I would wait, get some sleep and a proper rest and ask him what had happened.  I'm not really sure, but I think after this, we had other act, one other relation.  We slept for a few hours and woke up around 11am.  When I woke up, my period was close to coming; about few days after.   When I woke up, I was bleeding, but I didn't think this was a problem as my period was coming.  My blood was in the bed sheets.  I just realised that I was bleeding when I got up, so I went to have a shower.  I got my clothes on and then he started to talk to me about the last night. Asked me if I enjoyed it, if I had good feelings about it?  I just wanted to understand what he had did to me.  When I asked him what he had done, he explained that there is a kind of

technique that he does when having sex: he explained me that when we pass out, we have the same feeling as using a drug, that you have the same feelings as this. He asked me if I had enjoyed that? I didn't have a right opinion about it as it was the first time that I had done it, that I had got really scared when I woke up. After that he started to say that it was normal; that when you do it, you can get addicted to it, he was trying to get me to think about doing it again, that it would just get better and that I would start to enjoy that. Then I didn't feel comfortable talking about it, so I changed the subject. We planned to spend the day together and that was my second day in Paris. After this I went to my Hostel to have a proper shower and change my clothes. He went to get some food and we decided to meet at the Eiffel Tower again. We spent the second day together. We met at around 3 p.m. My phone battery was dead and he gave me his charger to use. Then we spent some time at the Eiffel Tower and the Park. We then went for some food and some ice cream. We went to the Arc de Triomphe then and spent some time there. We stopped on the way and he bought some product to clean the bed sheets. He later asked me again if I wanted to go to his place and I said no, that I wanted to rest and enjoy my last day in Paris. We spent a few hours talking to each other, it was late, the subway was closed, so I decided to get a taxi back to the Hostel. Then he just gave the idea to take the same taxi; that he would stop at his place and that I would go then to my Hostel. We went to his place first, we said goodbye to each other and I kept going to my Hostel. I didn't see Kevin on my last day in Paris and I flew back to Dublin in the evening of the ninth of April. When I was on my way to Dublin, he sent me a text to have a safe journey. We didn't send too many texts in the beginning. He followed me on Instagram and I followed him. We both knew where each other were and what we were doing. We kept in contact by Instagram and WhatsApp. When we were in Paris we spoke about him coming to visit Dublin as he was doing a Euro-trip. After the first few days we weren't talking much, but I then saw a picture of him on Instagram, and I text him on

Instagram that I was waiting for him in Dublin. Then he replied asking when I was free, when I was off. I gave him all the days that I was off; there was a week that I was off, from the second of June until the fifth of June. He replied that he would start planning to come to Dublin at this time. We started texting more often then, by WhatsApp and iMessage. We had some phonecalls to arrange this, to arrange an AirBnB and that. We had two phonecalls and spent a long time talking. In the first one we talked about his trip and my life in Dublin here, and at the end of the phone call he told me that he had a dream with me and that he wanted to turn off the light of the bedroom and while he was telling me his dream, he was giving me instructions as to what to do. I was touching myself and I know he was touching himself. After he finished telling me his dream, he just hung up the phone, it was late in the night and I went to sleep. We kept texting each other to decide about Dublin, to get an Air BnB that wouldn't be too expensive and that the location would be good. He had booked on Air BnB from the fourth to the sixth of June and we were planning to go to another town in Ireland for the first two days; the second and third of June. The prices of Air BnB's were expensive and I told him that maybe it would be better to spend the time in another place as I live in Dublin and know everything already. We started to look for flights to other cities; the flights that I could afford; he had been there already. As we decided to go somewhere else, he cancelled the Air BnB that he had booked. We decided to keep the idea of Dublin, to spend all the time here, I said ok and to get on Air BnB. When we were looking for an Air BnB, I booked the Air BnB, it was 10H Viking Harbour Apartments. I booked it online and I paid for it with my Debit Card. I booked for the third until the sixth of June. When I booked it, one or two days later, he bought his flight to Dublin. He booked with Ryan Air and was due to arrive at 10.35 a.m. on the third. He travelled to Dublin and I went to meet him. We got a bus to the City Center, we arrived in the afternoon and we got off the bus on O'Connell Street. We went to a Tourist shop to buy the tour for the cliffs. We went to the apartment to

check in, as Dee was waiting for us.  We walked to the apartment and met Dee.  She gave us the keys, showed us the apartment and she explained about the check out and she left.  On this day my sister was doing a birthday surprise for her husband, Sean; he is my brother in law.  I went to the apartment to leave my things there.  It was about 1 p.m. on the third. Kevin stayed in the apartment and I left to go to Kildare to my sister.  I got a Luas and then a bus in Connolly Station.  I returned around 8 p.m.  I went to meet Kevin in the apartment then, after I had text him.  I got the keys of the apartment; he went to get something to eat on his own and I had a shower in the apartment.  I had a short nap then, about fifteen minutes and I got ready as we were supposed to go out to a pub or something like this.  He arrived back, we hadn't spent that much time together, so we started to kiss each other and at this point we were in the bedroom, this was about 9 p.m.  Things started to get hot and we start to take each other's clothes off.  I stopped at this time and went to my bag.  I told him that I had brought a preservative this time: what I mean by preservative is a condom.  Then I showed him that I had a lot of them.  At this point I just had my underclothes on and him also.  The preservative had a black package with white writing on it.  Then I had loads of them and he said that we wouldn't use any of them.  I said that we wouldn't have relations unless he used one.  I forgot to say that when I was in Kildare, Kevin went out of the apartment and got a bottle of Vodka to bring back to the apartment.  Kevin tried to keep touching me and turning me on; he kept trying, but I said no, that we wouldn't have relations without a preservative, that we took that risk in Paris.  When I said that, then he said that we wouldn't have any sex for all the days that he was on holidays.  I said that I was fine with that, that I wasn't waiting for him to come here just to have sex, that I wanted to enjoy his company.  When I said that, he said that it wouldn't work, he was telling me that he wouldn't be sleeping in the same bed, without having sex.  When he said that I got upset and got up to put my clothes on.  I went to the living room.  It was dark outside; I got my phone and started to think what would be the

best decision to take.   Then I was walking around and got some water.   I went back to the

bedroom and Kevin was there putting his clothes on and packing his things.   When I saw

this, I started to sit on the bed and eat some snacks.   He asked how this was going to work?   I

said, I don't know what do you want me to do?   I started to say that if he was only here to

have sex, then he should've told me that, then we wouldn't be having this problem.   We

started to argue a bit then, when he saw that we wouldn't have sex, he got mad with my

decision.   I remember that I said, I would go back to my house and that he could stay in the

apartment and bring as many people back there to have sex.   When I said that, he was

completely different. he said that I was a bitch.   I wasn't offended by this.   I had a place to

go and he had a place to go, it was the only choice.   He was getting a bit louder. but I was

fine.   I was saying things really calm.   He said sorry for calling me a bitch, that we could

figure something out.   Then he started to say that we could stay as friends, that we could see

how things would go for us without sex.   That we could see how it went without sex.   It was

getting late.   I didn't say anything else.   He left the bedroom, grabbed the bottle of Vodka and

said we should do a game of shots, as this couldn't go any worse.   I just decided to do the

game; it was that each of us should say an action or word that the other didn't like about the

other one during the argument, each time we said something, we had to take a shot.   We had

about six shots.   He said that he didn't like that I made a decision so fast.   Then I said that I

didn't like the way he acted on the bed, closing his eyes and not talking, asking me for a

minute.   I would say this was about mid-night.   We were in the bedroom.   At one of the

shots, he said that he wished we had a safe word, so that he would know that I really wanted

to stop.   I said ok, we can have a safe word, that it would be "Mamao", a Portuguese word

meaning a fruit.   He said that was great.   We kept doing the game, saying things that we

didn't like.   I told him that I didn't know much about him, that he didn't give me much

information about himself.   We kept playing the game; he then lay down on the bed and

asked me to lay down and stay beside him. At this point, both of us were drunk. We started to kiss each other and had a sexual relation. We didn't use a condom, but he had my consent. I didn't ask him to stop. We had sex on the bed. In the middle of it, I said "Mamao", and he stopped, he respected what I had said. We went to sleep and we woke up very early it was about ten past five. I forgot to mention that earlier, when we were agreeing the safe-word, Kevin tried to put on one of the condoms that I gave him but it didn't work because he told me that when his penis gets hard, the condom wasn't wide enough for his penis, that it would hurt him and he wouldn't be able to keep doing it. On the Monday morning, the fourth day of June. we woke up and even though I had agreed to it, I regretted what we had done without a condom. Before I met Kevin I had had sex without a condom and that was when I had my first sexual relation. After this I promised myself that I wouldn't have sex again without a condom. I was worried that I may get pregnant or get a disease. When I woke up on the Monday and this had happened, I wasn't happy for what had happened because I had allowed something to happen that was against my thoughts. We were going to the Cliffs of Moher that Monday by bus. I don't know the name of the company. We got the bus from Dame Street, in front of H and M. It was about ten to seven, am. It was a good day, but I didn't speak too much to him. I wasn't feeling good of the fact that we had sex without the preservative. This was down at the Cliffs and after that we went for dinner at a place called Doolin. After this point, we met a family there; they were really nice and Kevin was being really nice to them. When I saw this, I thought that maybe I was being too hard on him. I tried to convince myself that everything was free, that we could enjoy the trip; it was nearly over anyway. Then we went to Galway and started to talk more. I was more open to conversation. After this, we were on our way back to Dublin. We arrived back to Dame Street at half seven or right. We then went to Grafton Street to Burger King to use the toilet. On the way, we met one of my classmates, she's from Mexico; her name is Sheila. I asked

her if she had a nice place to recommend to get Mexican food?  She gave us the names of two restaurants; one was El Grito.  Me and Kevin then went to the restaurant and we had a meal.  I meant to mention that we had one beer each in Doolin.  We had our meal at about eight o'clock, we got it for take away and we brought it back to the apartment.  We got there about nine.  At 9 p.m. in the apartment, we put the food down on the table in the apartment. I lay down on the sofa because I was tired, this was in the living room.  Kevin went to the toilet and when he came back he lied down beside me.  I still had all my clothes on.  He still had all his clothes on.  He was kissing me and I was kissing him.  Then he started touching my body when I had all my clothes on.  I remember that I said that what happened yesterday is not going to happen again.  He was saying that that was alright, that he was just going to fool me that he wasn't going to do anything I didn't want to do.  Then he kept touching me and kept turning me on.  He took off the top that I was wearing' it was a black, sleeveless top and it is tight to my body.  I didn't have a bra on.  Kevin was wearing a black and white top, one half black and the other white.  He had black jeans and a black belt.  He was wearing a black boxer and black socks.  He had black runners on.  This was on the sofa in the living room.  Then he tried to pull my trousers off and then I said that I didn't want to take them off, because there was no reason to.  While I saying this he was already taking them down.  I said no, but he said he was only going to take them down to my knees.  When he did this, he said that he wasn't comfortable in his clothes, so he took all of his clothes off and was only in his underpants.  He was touching me at this point and I was enjoying what was happening, my body liked it.  I was having pleasure with it.  Everytime he saw that I was having pleasure, he changed what he was doing.  His behaviour changed, I could see that his face was different. He had a different look on his face when he was giving me pleasure to when we were having conversation.  I was laying down with my back on the sofa, Kevin was laying on his right, with his right arm behind me.  His other arm, he was touching me, his left hand.  When he

was touching me and saw that I was enjoying it, he pulled my trousers off. My trousers were black trousers with a white line on the side. My underwear was a black nickers with some details, some drawings. You can see my skin through the drawings. I was wearing black socks, with silver details and I had before white Addidas runners on. What happened was, the first thing I didn't want to do, he had already done. That was taking my trousers off. Then I started to say that I didn't want to do anything, that that was enough. He started to say "ssh", that he wasn't going to do anything that I didn't want. He got on to me at this time. He was still wearing his boxers. His penis was erect and when he got on me I tried to move up and away from him. When he saw this he turned me over so my front was on the sofa and my back up. When I was in this position, he took off my nickers and I don't know when he took off his boxers. We weren't kissing at this time because I wasn't facing him. Before this I remember that when he was touching me, we had a conversation about the safe-word. We agreed to change it from "Mamao" to "banana." He was trying to introduce his penis to my vagina and he did on a few times. I would feel all of his penis in my vagina. I was face down on the safe and I asked him to stop a few times, I kept saying no. I said "banana" too. His hand was on the middle of my back when this was going on. I was trying to move up and away when I felt his penis in my vagina, but I couldn't move away. I remember him telling me to put my bum up and then I kept saying no, that I didn't want to. I said it about three times and then I think he realised that I wasn't going to do what he was telling me to do. I don't think he ejaculated, he wasn't wearing a condom. This went on for about five or six minutes I think. His penis slipped out of my vagina and I was able to turn over and put my back on the sofa. Kevin then sat down at the other end and my legs were on his lap. My body was feeling really tired at this point, I felt that I was losing my energy. He was sitting beside me and touching his penis, telling me to go on his lap. I said no, that I didn't want to, that I had to rest, I was feeling tired. I said that you put your penis in me, that I told you not

to do it, that you're going to do it again.  He was trying to say no, that we weren't going to do anything; that it was just for me to sit, that he could feel me.  I remember that he tried to help me up. I said no, I then sat up on the sofa.  When I sat down, he got up and started to say that he wanted to feel the same pleasure that I was feeling.  That he wasn't and that I wasn't doing anything about that.  Kevin then went to the bedroom.  He was naked that I could see. I stayed sitting on the sofa.  He got one of the condoms that he had and brought it to show me, he said if you want to try with a condom, we try. It was a golden pack.  I was still telling him that I was too tired, that I needed to rest.  He was calling me to rest in the bedroom, but I said that I wanted to rest in the living room.  I remember him saying something like do I have to go there and carry you? Then I decided to get up and go to the bedroom.  He told me to lay on the bed, I went to the right side of the bed.  He came to me and put the condom on the little table beside the bed.  He started to touch me again to try to turn me on.  When he was doing this, he was telling me things like "look how wet you are." "You're enjoying this."  I was confused because of the things he was saying.  He started to rub his penis on my vagina, I was laying down and he was on top of me.  He didn't introduce his penis fully to my vagina at this point.  He then kept trying to put his penis in my vagina. I grabbed the condom from the table and put it in front of his face.  I asked him to put it on, he said yes that he would, but his penis wasn't hard enough yet.  He took it from me and put it under the pillow that was on my left side.  At this point we were having a relation, his penis was going into my vagina.  I was telling him to stop, to put on the condom.  This would have lasted for longer than the time we were on the sofa earlier.  When this was happening, I got the condom and opened it, saying that he had to put it on.  He took his penis out of my vagina and said, look, this is what's going to happen when I put it on.  He put it on and I think that he tried to introduce his penis into my vagina again what the condom on, but I'm not sure if he was only rubbing it on my vagina.   He took the condom off soon after when he saw that

his penis wasn't hard any longer. When he took it off, I didn't want to do anything. I knew he didn't want to have sex with a condom on. I then lay with my legs closed and he lay beside me, to my left. This is when he took the condom off. He knew my body was tired and that it wasn't responding to him trying to have sex with me without a condom. He was on my left side and he started to touch my vagina with his hand; in a way that my breathing was really fast. I was trying to move away from him then. I remember my head being out of the bed, touching the table beside it. I remember my breathing being heavy and he came with one hand around my neck, I think it was his right hand, I'm not sure. I was trying to stop breathing fast, because I knew what he was trying to do. I remembered what had happened on the first night in Paris with Kevin. When I was trying to breathe normally, he came with the other hand, now two hands on my neck. He was squeezing really hard. His penis wasn't in my vagina yet. I was trying to keep breathing. I remember trying to keep his hands away from my neck and there I passed out. When I woke up, I couldn't feel my body, I couldn't move. I wasn't strong enough. I remember he moved me. I wasn't touching the table anymore. Then he tried to turn me over, I stopped on my left side, I was feeling really week. I remember that he was saying "that's my girl" and "good girl", things like this. When I was on my left side like this, he was introducing his penis in my vagina fully. I couldn't stop him. He kept doing this for a while. I had to stop I said, because my body couldn't cope with it. I started asking him to please stop, that my body couldn't cope with it. I started asking him to please stop, that my body couldn't take it. He stopped and asked me did I need a break, but that we would go back to this, that he would let me have a break. I said that I was hungry, that I wanted to eat. The food that we bought was in the living room; he asked me if I wanted to have the food in the bed. I said no, I wanted it in the living room as I wasn't feeling good staying there. When he left the bedroom to get the food, I put my black top and my nickers on. Kevin had black shorts on. Both of us were in the living room, he was telling

me to take off my top and maybe put some shorts on. I said no, that it was cold. We sat down to eat the food. He started to tell me things like "did you say thank you." And when I tried to speak, he wouldn't let me say anything else, only thank you. We ate the food, I'm not sure what time it was, maybe midnight or a quarter to one. He was talking like everything was ok. He put a programme on his phone to watch. He said the food was delicious. I asked could I say what I think? Then he just looked at me and said, do you really think that this is the right moment to say that? I kept eating my food, and stopped talking to him. I was on the left side of the sofa and he lay down with his head on my lap and his legs on the right side of the sofa. We both fell asleep on the sofa then. At about a quarter to three I woke up and he told me to go to bed so we could rest that it was more comfortable. We both went to bed. He was trying to hug me. I was moving away. I was on my right side on the left side of the bed. I have to say that when he took my trousers off on the sofa, I didn't want to do anything like that. He kept telling me things to make me think I wanted to continue, but I didn't. I didn't give him consent to do the things to me that he did on that night. I asked him to stop. We went to sleep then after I took his hand away from my bum. I couldn't sleep. I had to move him away, I couldn't have his skin touching my skin. I woke up then at 8 a.m. to go to my classes. I spoke to Kevin when he woke up, I told him to stay asleep as I had to go to my class. He tried to hug me to keep me in bed, but I said no, that I had to go to my shower. I then went to class on Dawson Street. I called one of my friends on the way and told her what had happened. I then later left my class and went back to the apartment. Kevin was aware and was getting up. I said that I just came back to get my purse, that there was a problem in my job. I was there to get my stuff. He asked me was everything ok? I was trying to act normal, so he wouldn't suspect a thing. I told him that I would be back later, but I telephoned my sister. I met her in Bushy Park and I told her the story. We decided that we needed to get the Air BnB keys back from Kevin. I text Kevin asking him

where he was, telling him I needed a shower in the apartment, to meet me with the keys. We

met at Dublinia and I got the keys from him. I met my sister at the apartment then. We

packed up his stuff and told him to meet me at the apartment. We put his things outside the

gate on the street. Kevin arrived then and he was acting as everything was normal. He

asked me what was wrong? I told him that what he had done was wrong and that he didn't

respect my decisions and he started to argue with me. My sister told him to apologise, and he

did. He also sent me a whatsapp message later on that day apologising. Kevin's phone

number is 001 9542241588. I have kept his messages. Later that same day I came to the

station here to report what had happened.


This statement has been read over to me and it is correct. I have been invited to
make any changes or alterations I deem necessary, but do not wish to do so.

Signed: Vivian Evol Marques De Souza.
Witnessed: Cohan Reilly, Sergeant, ▓▓▓▓.